[No. D018084. Fourth Dist., Div. One. Feb. 2, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN FIELD, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IB through II inclusive.

## COUNSEL

John Field, in pro. per., Paul Bell and Diana L. Cuomo, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary Schons, Assistant Attorney General, Garrett Beaumont and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HALLER, J.*—Following a mistrial declared because of a hung jury, the jury in John Field's second trial found him guilty of first degree murder (Pen. Code,[2] § 187). The jury also found true allegations Field personally used a firearm in the commission of the offense within the meaning of sections 1203.06, subdivision (a)(1), and 12022.5. The trial court sentenced Field to the indeterminate term of 25 years to life on the murder count and imposed a consecutive 2-year term for the section 12022.5 firearm allegation.

Field appeals. His main assignments of error are the trial court erred by (1) prohibiting the defense from impeaching a key prosecution witness with

---

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[2] All statutory references are to the Penal Code unless otherwise specified.

a prior Oklahoma felony conviction; (2) allowing evidence that Field had claimed he had shot a policeman; and (3) allowing evidence of prior consistent statements by prosecution witnesses. By leave of this court, Field himself has filed supplemental briefs in propria persona, contending (1) he was denied effective assistance of counsel at trial; (2) the trial court erred by allowing evidence of his claim he had shot a policeman and also erred by not sufficiently dealing with juror misconduct; (3) there was misconduct by the prosecutor who failed to provide discovery in a timely fashion and misled the court on why she offered evidence of Field's claim of shooting a policeman; (4) there was jury misconduct in failing to follow instructions from the court and not disclosing information sought by the court; and (5) the bailiff failed to perform his duties.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 7, 1989, William Donald "Billy" Richardson was shot and killed while he was in the cab of Russ Wilson's (Wilson) pickup truck parked outside the Oceanside apartment complex where Wilson lived. At 4 a.m., police found Richardson's body lying on Farel Street. There were seven casings on the street near the body.

An autopsy disclosed Richardson was shot six times at close range; each of the bullet wounds would have been fatal.

Police never recovered the murder weapon or the pickup truck, and the case remained unsolved for more than a year. In September 1990, Oceanside police detectives interviewed Wilson and his wife, Buffy Jo Wilson (Buffy), in Oklahoma. Each identified Field as the killer of Richardson. Also during the interviews with the Wilsons, the name of Teresa Marandola, Field's girlfriend at the time of the homicide, was mentioned. Upon their return to Oceanside, the police detectives interviewed Marandola, who also identified Field as the killer of Richardson. After obtaining an arrest warrant, police arrested Field in Massachusetts.

In 1989, Field, Richardson and Wilson were associated in the business of manufacturing and selling methamphetamine in the Oceanside area. In addition to dealing methamphetamine, the trio, as well as Buffy and Marandola, regularly used methamphetamine and did so on the day of the Richardson homicide. Regular users of methamphetamine, also known as "tweekers," often develop bizarre thinking patterns and/or paranoia, believing there is a conspiracy out to get them.

Several weeks before Richardson was killed, Wilson invested $1,500 with Richardson and Field to participate in a "cook," a single session of manufacturing methamphetamine. Richardson was supposed to return the money

to Wilson within 96 hours, but he never did. Richardson told Wilson the manufacturing session was moved and delayed. For the next two months, Wilson tried unsuccessfully to get his money back from Richardson; the two often argued over the matter.

On July 4, 1989, Richardson was at Wilson's apartment and wanted to visit a woman who lived in Escondido. Although Wilson and Buffy, who were then engaged to be married, were planning to go to Tijuana with their friend Earl Rojillo, Wilson told Buffy to drive Richardson to Escondido. Wilson and Rojillo were to wait for Buffy to return before proceeding to Tijuana. Buffy did not return for several hours because Richardson raped her after they arrived in Escondido.

Wilson and Rojillo eventually left for Tijuana without Buffy and did not return until 4 a.m. the next day. When they returned, Buffy had "a big knot[] on her head, a big ole bruise on her face," and the apartment was in a state of disarray. Buffy, who had blackened her own eye, falsely told Wilson the apartment had been burglarized and the burglars had beaten her. She did not tell Wilson that Richardson had raped her. To explain why she had not immediately returned to the apartment from Escondido, Buffy concocted a story about Hell's Angels pulling her over on the highway and detaining her while they demanded to know where Richardson was. Upon hearing this story, Wilson became enraged and, armed with an AK-47 rifle and a .45-caliber automatic pistol, left to find Richardson; he believed Richardson was "directly responsible" for Buffy's injuries. When Wilson found Richardson, they engaged in a 10-minute "knock down, drag out fist fight" that lasted until they "beat the crap out of each other." Then the two of them decided to look for the people who supposedly roughed up Buffy.

Before July 6, 1989, Richardson had borrowed Wilson's pickup truck and departed from the area; he left a couple of duffel bags in Wilson's apartment. At 8 or 9 p.m. on July 6, 1989, Field and Marandola went to Wilson's apartment. According to Buffy, Field was looking for Richardson. According to Wilson, Field said Richardson had sent him over to pick up his duffel bags. According to Buffy, Field was "very uptight," and "very, very upset." According to Wilson, Field was acting normally. Field and Marandola stayed a short time and left with Richardson's bags.

Between 2 and 3 a.m. on July 7, 1989, Field and Marandola returned to Wilson's apartment and woke them up. According to Wilson, this time Field was "ranting and raving and raising hell about how he has got [Richardson] down in the truck." Field also said he had come to take away Buffy because Wilson was beating her up. Field, who was waving a .22-caliber automatic

pistol, said he was tired of Wilson and Richardson lying to him and was "going to get to the bottom of what was going on . . . tonight." Field told Wilson: "[S]omebody is going to get their ass shot tonight. Somebody is going to die. I am going to get to the bottom of this shit. I am going to find out who has been lying to me, who is going behind my back. One of you two is going to be it."

Wilson suggested they "get this settled" by talking to Richardson and finding out what was wrong. Field then walked outside and returned in three or four minutes and said Richardson was asleep in the truck. Field said: "Now is the time we can go down there and get him." After arguing some more with Field, Wilson suggested they all go outside. Field, Wilson, Marandola and Buffy left the apartment. Field approached the truck by himself. Wilson heard a shot and started running toward the truck; he heard three or four more shots as he ran. When Wilson was near the truck, he saw Field dragging Richardson out of the truck. Richardson fell onto the street and was left there.

Field ordered Wilson at gunpoint to get into the truck; Wilson complied and Field drove the truck away. While driving, Field told Wilson to get rid of the gun; Wilson took it, cleaned off the blood and fingerprints and threw it out the window. Buffy and Marandola followed in Buffy's car. After stopping at a gasoline station, the two vehicles were driven to the Escondido Auto Park, where a car belonging to Marandola's mother was parked. Field, Wilson, Marandola and Buffy got out of the vehicles. An extremely excited Field was talking about having just killed a guy and what the group needed to do next. Eventually, Field drove Buffy's car, Buffy rode with Marandola in her mother's car and Wilson drove the truck; all of them arrived at the apartment of Marandola's mother in Mira Mesa.

The four of them entered the apartment quietly as Marandola's mother slept and went into Marandola's room, where Field told the others they were accessories to murder and threatened to turn them in if they told the police what had happened. Field showed them a notebook containing newspaper clippings of crimes and accidents and claimed to have something to do with them. Over a defense objection, Wilson testified one of the clippings was about a policeman who was shot and Field said, "I shot this policeman" and threatened to do the same to his three companions if they did not "play along, get our alibis straight."[3]

On their way home, Wilson and Buffy stopped at a convenience store and purchased vinegar to clean the blood from the truck. At their apartment

---

[3]The trial court instructed the jury (1) the testimony about the police shooting was admitted for the limited purpose of understanding why Wilson acted in a particular way and (2)

complex, they parked the truck in visitor parking so it would not be associated with them. A few days later, they sold the truck. Shortly thereafter, Wilson and Buffy moved out of their apartment and stayed with friends in San Marcos until they moved back to Oklahoma around Labor Day of 1989. Wilson and Buffy were married in Oklahoma at the end of September 1989.

In September 1990, Buffy was interviewed by Oceanside police detectives in Oklahoma. Buffy initially told the police she and Wilson were in Tijuana when Richardson was killed; she testified she lied to the police because she was scared. However, after several hours of interrogation, Buffy discerned the detectives knew she was lying, "broke down," cried and told the truth.

Next, the detectives interviewed Wilson and told him there was no point in lying since Buffy had told the entire story. Wilson testified "at that point the cat is out of the bag, so I told them like it was."

Marandola testified under a grant of immunity. She related that she, Field and Richardson had driven to the Wilsons' apartment on July 7, 1989, in Wilson's pickup truck. She and Field had consumed a good deal of methamphetamine; she was not sure whether Richardson had consumed any. Richardson, who had a .44 magnum in his possession, and Field were arguing about tapes that had been removed from a telephone recorder; the tapes contained conversations about drug traffic. Marandola and Field went to the Wilsons' apartment while Richardson waited in the parked truck. While they were in the apartment, Field said he was going to kill Richardson. After about 10 or 15 minutes, Field left the apartment, but returned shortly and said Richardson was asleep in the truck. Field left the apartment a second time and returned to the truck; Marandola heard three or four shots. She did not report the homicide to the police because she believed Field when he said she and the Wilsons were accessories.

Field did not present a defense. His counsel argued the evidence raised a doubt about Field's responsibility and pointed to Wilson as the likely killer.

DISCUSSION

I.  *Arguments Raised by Appellate Counsel*

A.  *Impeachment With Expunged Oklahoma Conviction*

██      Field contends the trial court erred in prohibiting the defense from impeaching Wilson with his prior Oklahoma conviction for pointing a firearm at another. The contention is without merit.

---

"[f]urther investigation has indicated the defendant had no connection to the shooting of any police officer."

Evidence Code section 788 provides in pertinent part:

"For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless:

". . . . . . . . . . . . . . . . . . . . . . . . .

"(b) A certificate of rehabilitation and pardon has been granted to the witness under the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code.

"(c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense.

"(d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

Here, the trial court ruled that Wilson could not be impeached with his prior Oklahoma conviction because as of the date of Field's second trial the conviction had been expunged pursuant to Oklahoma Statutes, title 22, section 991c, which provides in pertinent part: "Upon completion of the probation term, which probation term under this procedure shall not exceed five (5) years, the defendant shall be discharged without a court judgment of guilt, and the verdict or plea of guilty or plea of nolo contendere shall be expunged from the record and said charge shall be dismissed with prejudice to any further action."

Field argues this was error because (1) insufficient evidence of expungement was presented to the court; (2) the Oklahoma expungement provision was not substantially equivalent to section 1203.4; and (3) under Proposition 8, the expungement limitation on the admissibility of prior felony convictions has been abrogated. We disagree on all three points.

The issue of using Wilson's prior Oklahoma conviction arose when the prosecution moved *in limine* to bar use of the expunged conviction for impeachment purposes. The court was informed of the date and nature of the conviction and the fact that it was used to impeach Wilson during Field's first trial because it had not yet been expunged as of the first trial. Neither

party had a copy of the Oklahoma expungement statute for the trial court's review, but the prosecutor did provide an oral summary of the provision. The prosecutor also made an offer of proof that Wilson currently had no criminal record in Oklahoma because the conviction had been expunged. The trial court found the Oklahoma expungement statute tantamount to section 1203.4 and therefore concluded Evidence Code section 788, subdivision (d), was applicable. At the same time that the trial court ruled the Oklahoma conviction was not usable for impeachment purposes, the court also left open the door for the defense to show the conviction had not in fact been expunged.

In contending that there was insufficient evidence of the expungement, Field argues the prosecution did not meet its burden of proof of the preliminary fact of expungement. (See Evid. Code, § 405; Cal. Law Revision Com. com., Deering's Ann. Evid. Code, § 405 (1986) pp. 150-151.) There is no merit to this argument. The prosecutor made an offer of proof that the Oklahoma conviction had been expunged, and the defense did not contest the offer, arguing instead that it did not matter whether there had been an expungement. Further, despite the trial court's open invitation to refute the Oklahoma expungement, the defense did not subsequently attempt to do so. Indeed, the expungement itself never has been a disputed factual issue in this case. In light of the uncontested offer of proof, and the subsequent lack of any dispute of over whether there had been an expungement of the Oklahoma conviction, there was no error.

Field next argues that the Oklahoma expungement statute is not "substantially equivalent" to section 1203.4; this is the core of the assignment of error.

■ Generally speaking, "Expungement is a legislative provision, as opposed to executive, for the 'eradication of a record of conviction or adjudication upon the fulfillment of prescribed conditions . . . . It is not simply the lifting of disabilities attendant upon conviction and a restoration of civil rights, though this is a significant part of its effect. It is rather a redefinition of status, a process of erasing the legal event of conviction or adjudication and thereby restoring to the regenerative offender his *status quo ante.*'" (*United States* v. *Fryer* (N.D.Ohio 1975) 402 F.Supp. 831, 834, quoting Grough, *Expungement of Adjudication Records*, 1966 Wash. U. L.Q. 147, 149.)

Section 1203.4 provides that a successful probationer "shall thereafter be released from all penalties and disabilities resulting from the offense . . . ." (§ 1203.4, subd. (a).) In *People* v. *Butler* (1980) 105 Cal.App.3d 585, 587 [164 Cal.Rptr. 475], this court addressed the workings of section 1203.4 as follows:

"Section 1203.4 allows any convicted felon or misdemeanant who has been granted probation to petition to have his record expunged, after the period of probation has terminated. If the relief is granted, the probationer is relieved from some of the disabilities and penalties associated with being convicted.

"With exceptions not applicable here, petitioner is entitled to relief if he comes within any one of three fact situations: (a) he has fulfilled the conditions of his probation for the entire period; (b) he has been discharged before the termination of the period of probation; or (c) in any case in which a court, in its discretion and the interests of justice, determines he should be granted relief (§ 1203.4, subd. (a)). If the petitioner comes within either of the first two fact situations, the court is required to grant the requested relief [citation]. A grant of relief in the third situation is clearly discretionary."

This court also has observed: "A grant of relief under section 1203.4 is intended to reward an individual who successfully completes probation by mitigating some of the consequences of his conviction and, with a few exceptions, to restore him to his former status in society to the extent the Legislature has power to do so [citations]." (*Selby* v. *Department of Motor Vehicles* (1980) 110 Cal.App.3d 470, 473 [168 Cal.Rptr. 36].)

The California Legislature has seen fit to render convictions expunged pursuant to section 1203.4 as incompetent impeachment evidence for ordinary witnesses in civil or criminal trials. (See Evid. Code, § 788, subd. (c); see also *People* v. *Mackey* (1922) 58 Cal.App. 123 [208 P. 135].)[4] Expungement under section 1203.4, of course, does not obliterate a conviction for all purposes. For example, such an expunged conviction must be disclosed in applying for public office or license and may be considered by licensing authorities. (See § 1203.4, subd. (a); *In re Phillips* (1941) 17 Cal.2d 55, 59 [109 P.2d 344, 132 A.L.R. 644].) Also, records of a conviction expunged under section 1203.4 are accessible to the public. (See *People* v. *Sharman* (1971) 17 Cal.App.3d 550, 552 [95 Cal.Rptr. 134]; see also 3 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 1718, pp. 2031-2034 [remaining effects of conviction dismissed pursuant to § 1203.4].) ■ Similarly, our review of Oklahoma case law indicates the obliterative effects of Oklahoma Statutes, title 22, section 991c are not absolute. Under Oklahoma law, once a conviction has been expunged pursuant to Oklahoma Statutes, title 22, section 991c the conviction is not a proper subject for impeachment

---

[4]This rule does not apply to a criminal defendant who takes the stand in his own trial; such a defendant may be impeached with a conviction that had been expunged pursuant to section 1203.4. (See Evid. Code, § 788, subd. (c); *People* v. *James* (1940) 40 Cal.App.2d 740, 746 [105 P.2d 947].)

(*Belle* v. *State* (Okla.Crim.App. 1973) 516 P.2d 551), but the Oklahoma statute does not authorize the trial court to expunge arrest records (see *State ex rel. Hicks* v. *Freeman* (Okla.Crim.App. 1990) 795 P.2d 110, 112.)

The main thrust of Field's attempts to show that the Oklahoma expungement statute is not substantially equivalent to section 1203.4 is that the two statutes differ procedurally. Under section 1203.4, the defendant applies to the court to withdraw his plea of guilty or plea of nolo contendere and enter a not guilty plea, or if convicted under a not guilty plea, to set aside the guilty verdict. (§ 1203.4, subd. (a).) Notice must be given to the prosecutor in the case. (§ 1203.4, subd. (d).) The Oklahoma statute, on the other hand, provides for expungement of the conviction upon completion of probation for those probationers who have not previously been convicted of a felony (Okla. Stat., tit. 22, § 991c); in other words, the statute does not contemplate an application process as does section 1203.4.

Field argues unpersuasively this procedural difference is substantive because in California expungement is not automatic and a California judge can review the probationer's overall record on probation before granting relief under section 1203.4. This distinction is de minimis. While section 1203.4 requires an application be made, the statute also provides that the probationer who fulfills the conditions of probation for the entire period of probation or who has been discharged before the termination of the probationary term is entitled as a matter of right to expungement of the conviction. (*People* v. *Butler*, *supra*, 105 Cal.App.3d at p. 587; see also *People* v. *Hawley* (1991) 228 Cal.App.3d 247, 249-250 [278 Cal.Rptr. 389]; but cf. *People* v. *Chandler* (1988) 203 Cal.App.3d 782, 788-789 [250 Cal.Rptr. 730] [expungement could be denied a probationer who did not pay restitution even though the trial court had not revoked probation].) The differences between the expungement statutes are not substantive in nature because in both states expungement is a matter of right except where the probationer has not successfully completed probation. In California, under such circumstances, expungement is within the court's discretion. (*People* v. *Butler*, *supra*, 105 Cal.App.3d at p. 587.) Moreover, Field's argument that Wilson would not have been able to have his conviction expunged under section 1203.4 because of probation violations is largely speculative because it assumes Wilson's purported probation violations would have come to the attention of authorities and those authorities would have moved to contest Wilson's right to expungement.

We are convinced, notwithstanding their procedural differences, that the respective expungement statutes of California and Oklahoma are substantially equivalent in that both were enacted to eradicate the record of conviction for certain purposes when a probationer has successfully completed

probation. (Accord, *People* v. *Wright* (Colo.Ct.App. 1984) 678 P.2d 1072, 1074.) It is unrealistic to expect the legislatures of every state to adopt identical provisions for such procedures as expungement of convictions. (See, e.g., 21A Am.Jur.2d, Criminal Law, § 1021, p. 562 [return, destruction, or expungement of records or identification materials].) Furthermore, the classification of a foreign conviction is controlled by foreign law. (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 296, fn. 6 [165 Cal.Rptr. 308, 611 P.2d 902].) Under the law of Oklahoma, Wilson's Oklahoma conviction has been expunged and it is no longer a viable felony conviction. Under the law of California, the Oklahoma expunged conviction is not admissible for purposes of impeachment. (*Ibid.* [admissibility of a foreign conviction "is always governed by the law of this state"]; Evid. Code, § 788, subds. (c), (d).)

Finally, with respect to Wilson's Oklahoma conviction, appellate counsel argues that the expungement limitation on the admissibility of prior felony convictions under Evidence Code section 788 has been abrogated by Proposition 8.[5] We reject this argument.

In *People* v. *Wheeler* (1992) 4 Cal.4th 284, 288 [14 Cal.Rptr.2d 418, 841 P.2d 938], our Supreme Court reviewed Proposition 8's "Truth-in-Evidence" amendment to the state Constitution (see fn. 5, *ante*) and concluded it abrogated the rule that a felony conviction is the only form of conduct evidence admissible to impeach a witness's credibility. The *Wheeler* court also noted that the "Truth-in-Evidence" provision "supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of [the provision] itself." (4 Cal.4th at p. 291.)

Appellate counsel would have us conclude that under this constitutional provision expungement is no longer a viable ground for exclusion. We

---

[5] Appellate counsel refers to the following two provisions of Proposition 8:

"Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const., art. I, § 28, subd. (d).)

"Use of Prior Convictions. Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding. When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." (Cal. Const., art. I, § 28, subd. (f).)

decline to reach that conclusion for the very fact of expungement prevents a prior conviction from being *relevant* evidence on the issue of one's credibility. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) ▮ A prior conviction is relevant to one's credibility if the conviction involves moral turpitude. (See *People* v. *Castro* (1985) 38 Cal.3d 301, 313-315 [211 Cal.Rptr. 719, 696 P.2d 111].) The legislative purpose behind expungement is that "no convicted person discharged after probation thenceforth should be regarded as one possessed of the degree of turpitude likely to affect his credibility as a witness." (*People* v. *Mackey, supra,* 58 Cal.App. at p. 131; see also *People* v. *Jackson* (1986) 177 Cal.App.3d 708, 712 [222 Cal.Rptr. 470].) Accordingly, we conclude the Truth-in-Evidence provision has no effect on the expungement limitation of Evidence Code section 788.

We also find it of no moment that the Proposition 8 provision calling for unlimited use of prior felony convictions (see fn. 5, *ante*) does not provide for expungement. A felony conviction is inadmissible hearsay except under Evidence Code section 788, which permits it for purposes of impeachment. Once a conviction has been expunged, it no longer is a viable conviction for impeachment purposes. (See Evid. Code, § 788, subd. (c).) In other words, by virtue of expungement, there no longer is a prior conviction.

B., C.*

· · · · · · · · · · · · · · · · · · · · · · · ·

II.   *Arguments Raised by Field in Propria Persona**

· · · · · · · · · · · · · · · · · · · · · · · ·

DISPOSITION

Affirmed.

Huffman, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied February 24, 1995, and appellant's petition for review by the Supreme Court was denied May 10, 1995.

---

*See footnote 1, *ante,* p. 1778.