[No. G024042. Fourth Dist., Div. Three. Nov. 22, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
SALVADOR MARTINEZ, Defendant and Appellant.

[No. G030316. Fourth Dist., Div. Three. Nov. 22, 2002.]

In re SALVADOR MARTINEZ on Habeas Corpus.

1072

**COUNSEL**

Cindi B. Mishkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Raquel M. Gonzalez and Elizabeth S. Voorhies, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.**—In what must be the ultimate proof of that old cliché—only a fool has himself for a client—Salvador Martinez insisted on representing himself during trial. He lost. And, because this embezzlement conviction

was his third "strike,"[1] his sentence for this conviction was 25 years to life in prison. When the presiding justice of this court refused his demand on appeal to again represent himself, Martinez appealed all the way to the United States Supreme Court,[2] which unanimously held he must have counsel on appeal. (See *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152 [120 S.Ct. 684, 145 L.Ed.2d 597].) We then appointed an attorney, who now *successfully* convinces us in the appeal and the consolidated petition for writ of habeas corpus that the prosecution withheld material evidence impeaching a prosecution witness, thus violating Martinez's due process rights.[3] Because we agree with this argument, we reverse the judgment and grant the petition.

FACTS

In January 1998, a criminal defense attorney, Lawrence Merryman, and his office manager, Juan Esquivel, hired Martinez for general office work. Merryman never authorized Martinez to deal with clients directly or to accept funds from them, although Esquivel was the person who supervised Martinez and hired him. Both Merryman and Esquivel testified they never accepted money from clients or their families for the purpose of posting bail: They routinely referred clients to bail bondsmen for that purpose.

In March 1998, Merryman and Esquivel both went on vacation. Three persons had access to the office during their absence: Raul Contreras, Abel Herrera and Martinez. Martinez was ostensibly left "in charge of the office," although Merryman understood Martinez's duties were limited to answering the telephone and taking messages.

Before leaving on vacation, Merryman was retained by Marisela Pescador to defend her boyfriend, Sergio Valencia. While Merryman was gone, Pescador phoned the office, and Martinez told her that he was in charge while Merryman and Esquivel were away. She stated she wanted Valencia released from jail, and Martinez told her he would find out the bail amount

---

[1]His prior felony convictions were from Texas and constituted prior prison terms as well as prior "strikes." (See Pen. Code, §§ 667, subds. (d)-(e), 667.5, subd. (b).)

[2]Martinez filed his notice of appeal with us in 1998 and requested our permission to proceed in propria persona, which was denied. He petitioned the California Supreme Court for mandamus, asserting he had a constitutional right to represent himself on appeal. They disagreed. He then successfully petitioned the United States Supreme Court, which granted certiorari and permitted appointed counsel to brief and argue Martinez's case, contending he had a right to represent himself on appeal.

[3]In the appeal, other issues are raised, such as an attack on the sufficiency of evidence supporting the prior conviction allegations, certain instructional issues, and the constitutionality of the sentence as cruel and unusual punishment. We need not address these issues as the reversal of the judgment renders them moot.

and call her back. Later, she received a call from Martinez, who said he needed $6,000 to post bail—which was set at $600,000—and obtain Valencia's immediate release. She proceeded to gather the $6,000 from friends and family and met with Martinez the next morning at Merryman's office. Martinez wrote out a receipt for the funds and indicated he had to leave promptly for the Orange County jail to secure the release. Pescador never saw Martinez—or the money—again. Her boyfriend, needless to say, remained in jail.

After Esquivel and Merryman returned from their respective vacations, Martinez failed to appear for work. Both men testified that they were unable to find any office record indicating a receipt of funds from Pescador, who reported the money loss to police on April 6. A police investigator went to the motel at which Martinez was registered, but he was not there. The police, however, began a surveillance of his motel room and arrested him when he later emerged from it, carrying a duffle bag. He had about $300 on him at the time of his arrest.

Martinez told the officers[4] he accepted the $6,000 from Pescador to post the bond with a bail bondsman he found in the Los Angeles yellow pages, after he learned the bail was set at $620,000 and the bondsman's office informed him the bond would cost $6,000.[5] He added that he later met with a courier from the bondsman's company and delivered the money to him, but could not remember the name of the company or the courier, nor did he obtain a receipt from the courier for the funds. He said he attempted to get Valencia's bail reduced before the funds were actually posted. The bail amount was eventually reduced to $80,000. He admitted he failed to document any of these events in Pescador's file, but asserted that he recorded the transaction on "Post-its" which he placed on Esquivel's desk.

At trial, Martinez represented himself. He testified he was not accurate in his statement to the police because he had not, as yet, discussed the matter with Merryman or Esquivel and did not want to jeopardize any attorney-client relationship or confidentiality. He swore that he spoke with Esquivel by phone after receiving the money from Pescador. Esquivel ordered him *not* to do anything on Valencia's behalf, but to closet the money in a cabinet behind Merryman's desk. He did so, and informed Merryman in a phone conversation that he had deposited the funds in the cabinet and would return

---

[4]The officers properly advised Martinez of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and he waived those rights before interrogation commenced.

[5]In his statement to the police, Martinez maintained he was told the bond would cost $6,000, although such a bond would normally cost 10 percent of the total amount, or $62,000.

to the office after a short vacation of his own. He told the officers the story about the bondsman's courier only because he did not know what to say to them. He knew the bail was set at approximately $600,000, and the bondsman told him he would need 10 percent of that amount to post the bond. He had miscalculated the proper amount and mistakenly told Pescador the amount was only $6,000, instead of $60,000.

Merryman testified on cross-examination that he telephoned his office twice while he was on vacation. He could not remember the contents of either of the phone conversations he had with Martinez, or if Martinez mentioned anything about any money from Pescador. He recalled only that Esquivel told him about the missing $6,000 after they both had returned from their vacation. Esquivel testified that Martinez never informed him of Pescador's request and the receipt of $6,000, much less the whereabouts of the funds. He also testified that he never told Pescador to contact Martinez during Merryman's absence in the event she needed assistance. Esquivel then denied having any felony convictions in his past; and the trial court barred Martinez from asking Esquivel about any "arrest[] for spousal abuse."

An attorney, Lawrence LaRocca, whose office was located next door to Merryman and who had dealt with Esquivel, testified that he had never had money difficulties when dealing with Martinez. On the other hand, his dealings with Esquivel were quite the opposite. In a few cases in which both law firms had been involved, LaRocca said Esquivel had been slow to pay them the money Merryman's office owed him. LaRocca testified, moreover, that other individuals, such as Herrera and Contreras, had access to the office during Merryman's absence, but that he had money problems only with Esquivel, as did another attorney, Charlene Dryer.

## DISCUSSION

### *Failure to Disclose Evidence*

Martinez contends the prosecution failed to disclose that Esquivel had a criminal history including three felony convictions—subsequently expunged—and a pending charge of spousal abuse. Martinez contends that had the evidence been divulged and admitted, a reasonable probability existed that a more favorable verdict would have resulted. Under the facts and circumstances of this case, we agree.

Martinez filed a request for "informal discovery" at the beginning of the criminal case, asking to be provided with "any felony conviction of any

material witness." However, he *formally* requested Esquivel's "rap sheet" only after Esquivel denied on cross-examination that he had any felony convictions. After both sides rested, the court inquired whether the prosecutor had obtained information on Esquivel's history. She replied there were so many entries under that name, she needed his birth date to locate the correct information. The court then mused that an investigation of Esquivel's criminal history was probably not required by the informal discovery request because it was not apparent before the defense case that Esquivel's testimony was "critical to the outcome of the case." The court then asked Martinez if the trial should be delayed in order to obtain this information. He declined the invitation and said he could raise the issue later. The prosecution stated it would investigate the matter, and the resulting information could be presented to the jury via stipulation if obtained before deliberations commenced. Apparently, the information was never obtained at all.

In a motion for new trial, Martinez submitted a declaration signed by an attorney, James Brustman, whom he met in the Orange County jail on August 11, 1998. In this declaration, Brustman averred he had known Esquivel for 10 years, had been informed by Esquivel that he had a prior felony conviction and had been arrested for possession of heroin. Furthermore, Brustman had shared office space with Esquivel, using him as a translator for a short time. That relationship resulted in Brustman's opinion of Esquivel as a "chronic liar and a dishonest individual . . . ." In his declaration, Brustman stated that *he had confirmed Esquivel's felony conviction with a lieutenant in the Orange County Sheriff's Department.* Despite these assertions, the motion for new trial was denied without comment from either the prosecution or the trial court. Judgment was imposed on August 28, 1998, sending Martinez to prison for life.

Following Martinez's journey to the United States Supreme Court, the Attorney General's Office in October 2001 informed Martinez—now represented on appeal—that Esquivel had *three* prior convictions in 1988 for insufficient-funds checks violations, but that all three cases had been reduced to misdemeanors *after* Esquivel had completed his probation, and they were then dismissed pursuant to Penal Code section 1203.4.[6] This revelation only came to light subsequent to this court asking for further briefing on whether the trial court abused its discretion in denying the motion for new

---

[6]Interestingly enough, the Attorney General's Office asserted it was unable to confirm or deny Esquivel's record as late as April 2001 when it filed its respondent's brief in the appeal of this case. However, in September 2001, this court requested further briefing sua sponte on whether the trial court erred in its denial of the motion for new trial. A month later, the deputy attorney general notified Martinez's appellate counsel that Esquivel's records had been obtained because *Martinez supplied the birth date in his written motion for new trial in August 1998.*

trial. In preparing her response to our order, the deputy attorney general discovered that Martinez had provided in his motion papers in 1998 two different routes by which the prosecution could have located Esquivel's criminal history: Both Esquivel's birth date *and* the name of the lieutenant in the Orange County jail—who barred Esquivel (because he was a felon) from entering the attorney-client interview room—were included in the moving papers. Following this discovery, the deputy attorney general also learned there were several counts stemming from arrests for drug offenses in 1984 in Calaveras County, all of which were ultimately dismissed under Penal Code section 1385. Most importantly for this case, there were two counts of corporal injury to a spouse (see Pen. Code, § 273.5) stemming from an incident in *March 1998*, to which Esquivel entered a no contest plea[7] and was placed on misdemeanor probation in October 1998, two months after Martinez was sentenced to life in prison. To the deputy attorney general's credit, the newly discovered information was then promptly and expeditiously provided to defense counsel and to this court.

██ Due process of law requires the prosecution to divulge all evidence to the defense which is both favorable to the accused and material either to guilt or to punishment (see *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]), including all information that could impeach prosecution witnesses (*United States v. Bagley* (1985) 473 U.S. 667, 675-676 [105 S.Ct. 3375, 3380, 87 L.Ed.2d 481]; *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]), such as any current charges pending against them. (See *People v. Coyer* (1983) 142 Cal.App.3d 839, 842 [191 Cal.Rptr. 376].) Additionally, Penal Code section 1054.1, subdivisions (d) and (e), mandates the disclosure of exculpatory evidence *and* any felony conviction of any "material witness whose credibility is likely to be critical to the outcome of the trial." Evidence is material if its admission at trial would have created the reasonable probability of a different outcome (*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490]), or, stated in a different way, if the absence of the evidence is sufficient to undermine confidence in the verdict. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 373 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

██ In April 2001, the Attorney General contended in its respondent's brief that there was no credible evidence of the existence of Esquivel's felony conviction for passing a check with insufficient funds, as Brustman alleged there was. Absent *some* credible evidence supporting it, the prosecution did not violate its duty to divulge it. In July 2002, however, the deputy

---

[7]Esquivel was represented by Lawrence Merryman during the pendency of the spousal abuse case until a couple of weeks before the start of Martinez's trial, at which time Merryman substituted out of the case because he averred he was a potential witness.

attorney general conceded in the return to the petition that "it would have been prudent for the prosecutor to have run a rap sheet on all of its witnesses prior to trial." She also agreed that "if the prosecution had discovered the existence of Esquivel's prior criminal conduct, it would have been required to disclose such information to the defense irrespective of whether any or all of it would have been admissible for impeachment purposes . . . ." Martinez's appellate counsel—limited as she was in her ability to obtain such records—responded in the reply brief in the appeal that the prosecution sat mute during the hearing on the motion for new trial when it could have denied the conviction's existence, and that Brustman declared under penalty of perjury that Esquivel's admission to him of the felony's existence was a declaration against penal interest under Evidence Code section 1230.

Six months after the brief was filed in this appeal, the Attorney General's Office had occasion to read Martinez's new trial motion papers and, from those papers, obtained proof that Esquivel *had* been convicted of three felonies and had a pending charge at the time of Martinez's trial. The three felonies had been expunged on or about April 1992, and the Attorney General argues that either: (1) the expungement eliminated the potential use of these prior convictions as impeachment evidence pursuant to Evidence Code section 788, as interpreted in *People v. Field* (1995) 31 Cal.App.4th 1778 [37 Cal.Rptr.2d 803]; or (2) the passage of Proposition 8 in 1982 abrogated any limitation on the use of prior convictions, thereby allowing expunged felonies to be used for impeachment purposes.

For purposes of this case, the issue of the prior convictions' expungement—and its effect on impeachment—need not be addressed. Irrespective of the expungement's effect on the convictions' admissibility at trial, the prosecution still bore the burden of investigating and divulging the existence of such convictions. Both Merryman and Esquivel were crucial prosecution witnesses as they represented the business that was victimized by the embezzlement. Moreover, Martinez argued at trial that Esquivel—with possibly the assistance of Herrera or Contreras—was the actual culprit. In addition, Merryman was representing Esquivel in the pending misdemeanor case until the month before Martinez's trial commenced and was therefore fully aware of the pending charges against his office manager.[8] Moreover, once Martinez testified that he talked to Esquivel on the phone and informed him of the money, Esquivel rose to the level of *the* pivotal witness in the case, if not a serious suspect.

---

[8]Merryman represented Esquivel in the misdemeanor case from arraignment in April 1998 until June 1998 when Merryman informed the court he had to withdraw, as he was a potential witness in the case. William Kennon replaced him as the attorney of record on June 17, 1998.

The prosecution has access to all government records of criminal arrests and convictions, to which any defense counsel—much less a defendant proceeding in propria persona—is barred. "In the light of the great resources at the command of the district attorney and our commitment that justice be done to the individual, restraints are placed on him [or her] to assure that the power committed to his [or her] care is used to further the administration of justice in our courts and not to subvert our procedures in criminal trials designed to ascertain the truth. [¶] The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth . . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].)

Even if Esquivel could not have been impeached with the three prior felony convictions due to their expungement,[9] the prosecution failed to investigate the matter to determine the felonies' *existence*, much less their expungement. On the other hand, the prosecution protested that there were so many individuals under the name of Juan Esquivel that a birth date was necessary to narrow the search. But this person was *the prosecution's own witness*. Obtaining a birth date of an important prosecution witness—the office manager of the victim-business and an essential witness—is a fundamental aspect of a criminal investigation. Setting aside this duty, the prosecution was *given* two different routes by Martinez in his motion for new trial by which it could have located the records and yet failed to even attempt to comply with its duty.

■ It is long-standing law that a prosecution witness can be impeached by the mere fact of pending charges. (See *People v. Coyer, supra,* 142 Cal.App.3d at p. 842.) Such a situation is a "circumstance to show that he . . . may, by testifying, be seeking favor or leniency. [Citations.]" (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 271, p. 343.) ■ Although the charges pending against Esquivel at the time constituted only misdemeanors, the conduct underlying those charges was admissible to impeach despite the lack of a conviction. (See *People v. Wheeler* (1992) 4

---

[9]Both parties request we address the issue of the prior convictions' admissibility, arguing that Proposition 8 (see Cal. Const. art. I, § 28, subds. (d)-(f)) abrogated *any* limitations on the use of prior convictions in a criminal proceeding. They request we reject the rationale and holding of *People v. Field, supra,* 31 Cal.App.4th 1778, in which expunged felony convictions were held to be inadmissible for purposes of impeaching witnesses. (*Id.* at p. 1787.) However, that issue is not properly before us: The trial court never got the opportunity to address the admissibility of the prior convictions, either under the concerns expressed in *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] or *People v. Field, supra,* 31 Cal.App.4th 1778. The prosecution failed to meet its constitutional responsibility to even *find* them, much less divulge them. Our foremost concern is that deficiency.

Cal.4th 284, 288-295 [14 Cal.Rptr.2d 418, 841 P.2d 938]; 3 Witkin, Cal. Evidence, *supra,* § 314, p. 394; see also *id.,* § 306, pp. 383-384 [corporal injury on spouse is a crime of moral turpitude, citing *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [7 Cal.Rptr.2d 495]].) Had the prosecution fulfilled its obligation *at any stage of the proceedings,* the pending charges against Esquivel would have been discovered and presented to the jury. Although the prosecution argued it did not know Esquivel had a record, *the very same office was prosecuting him at the very same time this statement was made.* The prosecution failed to meet even the most minimal duty of providing impeachment information to the defense.

The deputy attorney general argues in response that, despite this error, it was not reasonably probable that a more favorable verdict would have occurred had this information been turned over or admitted. She argues that Martinez gave inconsistent statements to explain his conduct with the money, and that dissemblance rendered him totally incredible in the jurors' eyes. To the police, he said he gave the money to a courier for a bail bondsman. To the jury, he said he put the money in either Merryman's desk or cabinet and then informed Esquivel of this fact in a phone conversation before taking a brief vacation. Moreover, the evidence of Martinez's guilt was, she argues, "overwhelming." Martinez told Pescador the bail bond cost $6,000 and such an amount was implausible considering the boyfriend's bail was set at $620,000. Finally, Martinez accused not just Esquivel of taking the money, but also Herrera and Contreras. In what is presented as the ultimate point of persuasion, the deputy attorney general emphasizes that, "for the jury to have believed appellant's version of the challenged events it would have also had to question Merryman's veracity, as the attorney disputed appellant's claims of having told the attorney that: (1) clients were requesting assistance with bail-related matters in Merryman's absence [], (2) appellant was going on vacation between Friday[] and Monday[], and (3) appellant was going to leave Pescador's money in Merryman's office[]." The last point is not technically correct: Merryman testified he could not *recall* the contents of the phone conversations with Martinez. Nonetheless, the argument is less than convincing in light of the information subsequently revealed about both Merryman and Esquivel: Not only did Esquivel have criminal charges pending against him, but Merryman was representing him in that litigation until just before Martinez's trial.

Had the evidence of Esquivel's pending charges been admitted in the trial, it would have resulted in two dynamic changes in the status of the evidence.

It would have rendered Esquivel's testimony biased and unconvincing, and it would have cast the testimony of LaRocca and Dryer in an entirely different light. It also would have resulted in revealing that Merryman was concealing the pending charges against his office manager at the expense of his former employee, Martinez. The entire scene would have shifted in color from that presented in this trial. Extreme scrutiny on Esquivel would have resulted. If that phone conversation in which Martinez revealed to Esquivel where he hid the money occurred, Esquivel would be the more plausible suspect. Esquivel denied its occurrence; but the pending charges would have provided more than sufficient reason for him to deny the phone conversation and accuse Martinez of the theft.

The Attorney General counters that the accusations against Esquivel would have failed to support a reasonable doubt as to Martinez's guilt. Pursuant to *People v. Cunningham* (2001) 25 Cal.4th 926 [108 Cal.Rptr.2d 291, 25 P.3d 519], a foundation must be laid for such accusations, and, according to the respondent, Martinez could not have met that burden. ██ " '[E]vidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his . . . guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citations.]' [Citations.]" (*Id.* at p. 996.) ██ However, the combination of testimony from Martinez, Dryer and LaRocca met that requirement: It established the plausible explanation that the money was received from Pescador by Martinez, was closeted as instructed by Esquivel and then vanished only after Martinez informed Esquivel of its whereabouts. In corroboration of this plausible rendition of events, Dryer and LaRocca testified that Esquivel's history with money was poor.

We conclude it is reasonably probable that a more favorable verdict would have been rendered had the jury received the information the prosecution was constitutionally bound to produce. (See *Kyles v. Whitley, supra,* 514 U.S. at pp. 433-434 [115 S.Ct. at pp. 1565-1566].) Using the alternative standard, the failure to provide the impeachment information on this pivotal witness has undermined our confidence in the verdict. (See *People v. Ochoa, supra,* 19 Cal.4th at p. 473.)

The petition for writ of habeas corpus is granted; writ to issue forthwith, reversing the judgment and conviction in this case and remanding the case for retrial.

O'Leary, J., and Aronson, J., concurred.

A petition for a rehearing was denied December 13, 2002, and the opinion was modified to read as printed above.