[No. E061187. Fourth Dist., Div. Two. Dec. 18, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
LEROY BURTON III, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1, 2, and 3 of the Legal Analysis.

**COUNSEL**

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McKINSTER J.**—Defendant and appellant Leroy Burton III appeals his conviction on one count of first degree murder. In the unpublished portion of

this opinion, we reject Burton's contentions that the evidence was insufficient to show that he deliberated and premeditated the killing, that the court erred in its instruction on premeditation and deliberation, and that trial counsel provided constitutionally deficient representation. In the published portion of the opinion, we reject the contention, based on *Morales-Garcia v. Holder* (9th Cir. 2009) 567 F.3d 1058 (*Morales-Garcia*), that intimate partner battery, in violation of Penal Code section 273.5, is not categorically a crime of moral turpitude. We conclude that Burton's two prior convictions for violation of that statute were properly admitted for impeachment purposes.

## PROCEDURAL HISTORY

Defendant was charged with the first degree murder of Ja'bari Jones and the personal use of a firearm causing death. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1] The information also alleged that defendant had one prior strike conviction and had served three prior felony prison terms. (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1), 667.5, subd. (b).)

A jury convicted defendant of first degree murder and found the gun use allegation true. Defendant admitted the prior conviction and prior prison term allegations, and the trial court accepted the admissions. The court sentenced defendant to three consecutive determinate terms of one year for the prior prison term enhancements and to a term of 50 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement.

Defendant filed a timely notice of appeal.

## FACTS

At approximately 1:00 p.m. on May 31, 2013, a resident of the Pepper Tree apartment complex in Riverside discovered Ja'bari Jones lying in the complex parking lot. Jones was lying near his parked car and was unconscious and bleeding. Paramedics performed chest compressions and CPR, but Jones did not regain consciousness. He was pronounced dead at the hospital. Jones had suffered two small-caliber gunshot wounds: a potentially nonfatal wound to his head and an inevitably fatal one to his chest. The gunshot to his chest entered through his left armpit and went through his heart. A live .22-caliber round and one expended .22-caliber shell casing were found near his body. No gun was found.

A resident of the complex saw defendant running through an alleyway in the complex between 12:30 and 1:30 p.m. on the same date. Defendant had a

---

[1] All further statutory citations refer to the Penal Code.

lanyard with keys around his neck and was clutching the waistband of his pants as though to hold them up. The witness did not see a gun and had not heard any gunshots. He had seen defendant in the complex four or five times before.

That same day, defendant phoned Brenika Thompson, who was the mother of his child, and asked her to come pick him up. He told her he had just shot at someone or had shot someone. Thompson refused to pick him up. She then called 911. An investigator came to her home and had her make a recorded call to defendant. During that conversation, defendant told Thompson that he had shot someone twice. He was very angry that the person had come to his home, where his family lived, to try to collect money the person claimed defendant owed him. Defendant said he had paid the debt and had paid an amount in excess of what he owed.

Defendant called his cousin to pick him up at an apartment complex where he had previously lived. When the cousin arrived, he could not find defendant. He went to a nearby gas station and went into the store. When he came out, defendant was standing in the gas station parking lot. Defendant got into the backseat of the car and lay down. The police were by then looking for defendant, and an officer saw defendant hop over a wall to enter the gas station parking lot. Police stopped the vehicle shortly thereafter and arrested defendant.

Damien Andrews, a friend of both defendant and Jones, told a detective that defendant had asked him to take him to a check cashing store so he could cash his tax refund check.[2] Defendant said he wanted to repay Jones some money he owed him. Defendant was unable to cash the check, however, because the clerk at the store believed the check had been altered.

During his interview with a police detective, defendant denied knowing Jones. He also denied owing anyone money and denied shooting Jones. He denied any knowledge of the incident that culminated in Jones's death.

At the trial, defendant admitted that he had lied to the detective. He said he did so because he does not trust the police, because he saw police shoot and kill his father when he was 14 years old. He testified that he owed Jones $100 from a marijuana transaction.[3] He had previously tried to repay Jones using a tax refund check, but he was not able to cash the check. On May 31, 2013,

---

[2] At trial, Andrews claimed not to remember talking to the detective and claimed not to remember anything concerning defendant's debt to Jones or attempting to assist defendant in cashing the check.

[3] Defendant also testified that he had already repaid Jones, but that on the day he tried to cash the tax refund check, he agreed to pay Jones $100 to placate him.

Jones came to the apartment where defendant lived with his aunt, two cousins and the young daughter of one of his cousins, and demanded the money Jones said defendant owed him. Jones had not let defendant know that he intended to come over that morning. When defendant said that he did not have the money, Jones pulled a gun from his waistband and ordered defendant to come with him. Jones took defendant at gunpoint to the parking lot of the apartment complex. When they got to Jones's car, Jones attempted to open the door of the car with his left hand. When defendant saw that Jones was distracted, he grabbed Jones's right wrist and kneed him, causing Jones to drop the gun. Defendant was scared.[4] He stepped back and then fired two shots at Jones without looking at him or aiming, and then ran away. He threw the gun into a dumpster in the apartment complex. He did not know whether he had shot Jones.

## LEGAL ANALYSIS

### 1.–3.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 4.

## VIOLATION OF SECTION 273.5 IS A CRIME OF MORAL TURPITUDE

Defendant contends that the court erred in admitting his two prior convictions for violation of section 273.5, willful infliction of corporal injury on an intimate partner, because such crimes are not crimes of moral turpitude and therefore could not be used to impeach him. In the alternative, he contends that his attorney provided constitutionally deficient representation by failing to object to the use of those prior convictions on that ground.

■ Any testifying witness can be impeached with evidence that he or she suffered a prior conviction of a felony involving moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 306 [211 Cal.Rptr. 719, 696 P.2d 111].) One definition of moral turpitude is a " 'general readiness to do evil.' " (*Id.* at p. 315.) Whether a crime is one of moral turpitude is determined not by the facts underlying a particular commission of the offense but from the statutory

---

[4] On cross-examination, defendant admitted that Jones was incapacitated at that point and that he was not reaching for another gun. He also testified that he was seven feet away from Jones when he fired.

[*] See footnote, *ante*, page 129.

elements test. (*Id.* at pp. 316–317.) If the crime can be committed in a way that does not amount to moral turpitude, it cannot be used for impeachment. (*Ibid.*)

Defendant suffered convictions in 2001 and 2005 for violating section 273.5. The version of that statute in effect on those dates provided in pertinent part: "(a) Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment. [¶] . . . [¶] (c) As used in this section, 'traumatic condition' means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force." (Former § 273.5, subds. (a), (c), as amended by Stats. 2003, ch. 262, § 1, p. 2412.)

California courts have held that section 273.5 is a crime of moral turpitude because the statute protects individuals who are in special relationships "for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it wilfully and with intent to injure,[8] necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [7 Cal.Rptr.2d 495]; accord, *People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080–1081 [127 Cal.Rptr.2d 305] [evidence of witness's pending spousal abuse charges was admissible for impeachment]; *Donley v. Davi* (2009) 180 Cal.App.4th 447, 461 [103 Cal.Rptr.3d 1] [§ 273.5 is a crime of moral turpitude as a matter of law].)

---

[8] The full quote from *Rodriguez* is as follows: "To violate Penal Code section 273.5 the assailant must, at the very least, have set out, successfully, to injure a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it wilfully and with intent to injure, necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez, supra,* 5 Cal.App.4th at p. 1402.) *Rodriguez* is mistaken that the statute requires the specific intent to injure. Rather, it requires a "willful" act which results in injury and is thus a general intent crime. (*People v. Thurston* (1999) 71 Cal.App.4th 1050, 1053 [84 Cal.Rptr.2d 221] [in the absence of further language denoting a requirement of specific intent, "willfully" denotes general intent].) And, as we discuss below, it no longer applies only to protect from injury a person of the opposite sex. These facts do not affect our conclusion that *Rodriguez* correctly concluded that a violation of section 273.5 is a crime of moral turpitude.

Relying on *Morales-Garcia, supra,* 567 F.3d 1058, defendant contends, however, that former section 273.5 is not a crime of moral turpitude because, unlike the other categories of victims named in the statute, cohabitants are not necessarily in a "special relationship of trust such as to make an assault by one on the other" a crime of moral turpitude, and former cohabitants certainly are not in such a relationship. (*Morales-Garcia,* at pp. 1064–1066.) Accordingly, he contends, the statute can be violated in a manner that does not constitute moral turpitude. We disagree with this interpretation.

We review issues of statutory interpretation independently. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20].) In matters of statutory interpretation, a court's task is to determine and effectuate the intent of the Legislature. (*People v. Cruz* (1996) 13 Cal.4th 764, 782 [55 Cal.Rptr.2d 117, 919 P.2d 731].) The Legislature has long recognized that violence between people in intimate relationships is common. It enacted former section 273d and section 273.5 to afford greater protection to intimate partners than is afforded by the battery statutes to people in general. (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 948–949 [217 Cal.Rptr. 616].) The statute initially applied only to domestic violence inflicted by husbands upon their wives or inflicted by anyone upon a child. (Former § 273d; see *Gutierrez,* at p. 948, fn. 2.) In response to the recognition that there had been a substantial increase in unmarried couples living together, in 1977 the Legislature amended section 273.5 to include spouses of both sexes in its protections, as well as cohabiting members of the opposite sex.[9] (*Gutierrez,* at pp. 948–949.) In light of the fact that the purpose of section 273.5 is to protect individuals from domestic violence in intimate relationships, it cannot rationally be argued that for purposes of that statute, "cohabitant" can be understood to encompass casual relationships. For this reason, California courts recognize that for purposes of section 273.5, "cohabitant" refers to those " ' "living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." ' [Citation.] 'The element of "permanence" in the definition refers only to the underlying "substantial relationship," not to the actual living arrangement.' [Citation.]" (*People v. Taylor* (2004) 118 Cal.App.4th 11, 18–19 [12 Cal.Rptr.3d 693]; accord, *People v. Belton* (2008) 168 Cal.App.4th 432, 438 [85 Cal.Rptr.3d 582] [" 'cohabitant' " refers to " 'something more than a platonic, rooming-house arrangement' "].) This understanding is further supported by the most recent amendment to section 273.5. The current version of the statute extends section 273.5 to "[t]he offender's fiancé or fiancée, or someone with whom the offender has, or previously had, an engagement or dating relationship, as defined in paragraph (10) of subdivision (f) of Section 243." (§ 273.5, subd. (b)(3).) Section 243 defines " '[d]ating relationship' " as "frequent,

---

[9] A 1994 amendment removed "opposite sex" as a limitation on cohabiting couples. (Stats. 1994, 1st. Ex. Sess. 1993–1994, ch. 28, § 2, p. 8612.)

intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations," i.e., not a casual social relationship but an intimate one. (§ 243, subd. (f)(10).)

In 1999, the Legislature amended section 273.5 to include former spouses and former cohabitants (Stats. 1999, ch. 660, § 2, p. 4900), and in 2013 to include current and former dating partners and currently and formerly engaged couples (Stats. 2013, ch. 763, § 1). The latter two amendments reflect the Legislature's understanding that domestic violence occurs in both cohabiting and noncohabiting intimate relationships (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 16 (2013–2014 Reg. Sess.), Mar. 12, 2013, pp. 4–6) and that "domestic violence which occurs after the victim has left the abuser . . . accounts for 75% of reported assaults by an intimate partner" (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 563 (1999–2000 Reg. Sess.) as amended Aug. 23, 1999, p. 7). Accordingly, the court in *Morales-Garcia, supra,* 567 F.3d 1058, is simply mistaken in holding that section 273.5 applies to casual cohabitants as well as to intimate cohabitants. It is also mistaken in its apparent belief that the California Legislature does not consider former intimate cohabitants to be in a relationship which by its nature is deserving of special protection.

■ The language employed in *People v. Rodriguez, supra,* 5 Cal.App.4th 1398 is obviously partially obsolete, in that section 273.5 no longer protects only persons of the opposite sex, and, as we pointed out above, *Rodriguez* is mistaken in saying that section 273.5 requires the specific intent to inflict injury. Nevertheless, the court correctly understood the basis for concluding that a violation of section 273.5 is a crime of moral turpitude: "[S]ociety rationally demands, and [individuals] may reasonably expect, stability and safety . . ." in the types of relationships specified in section 273.5. (*Rodriguez,* at p. 1402.) Accordingly, we agree with the California courts that have previously addressed this issue that violation of section 273.5 is a crime of moral turpitude as a matter of law. (*Rodriguez,* at p. 1402; *People v. Martinez, supra,* 103 Cal.App.4th at pp. 1080–1081; *Donley v. Davi, supra,* 180 Cal.App.4th at p. 461.)

■ Because defendant's prior convictions for violating section 273.5 involve crimes of moral turpitude, defense counsel's failure to object to their admission for impeachment purposes did not constitute inadequate representation: An attorney has no duty to make motions or objections that would be futile. (*People v. Price* (1991) 1 Cal.4th 324, 387 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

## DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 23, 2016, S232117. Kruger, J., did not participate therein.