Filed 4/23/15  P. v. Lefkovitch CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BARRY LEFKOVITCH,<br><br>    Defendant and Appellant. | 2d Crim. No. B250602<br>(Super. Ct. No. 2010045381)<br>(Ventura County) |

A jury found Barry Lefkovitch, a physician, guilty on three counts of forcible sexual penetration (Pen. Code,[1] § 289, subd. (d)(4); counts 1-3), one count of misdemeanor sexual exploitation of a patient (Bus. & Prof. Code, § 729, subd. (a), count 5) and one count of felony sexual exploitation of two or more patients (*id.* subd. (b)(3), count 6).

The court sentenced Lefkovitch to the midterm of six years on count 1; a consecutive two years on count 2; a concurrent six years on count 3; a concurrent 180 days on count 5; and a concurrent two years on count 6.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

We reverse count 5 as a lesser included offense of count 6. In all other respects we affirm.

## FACTS

### *Victim H.S. - Counts 1 through 3 (forcible sexual penetration) and count 6 (felony sexual exploitation of multiple patients)*

Lefkovitch was a medical doctor and partner at the Arroyo Oaks Medical Associates in Thousand Oaks. H.S. was a patient at Arroyo Oaks, but Lefkovitch was not her usual doctor.

H.S. saw Lefkovitch in November and December 2010, when her usual doctor was not available. H.S.'s sister brought her to the first appointment and stayed with her the entire time. H.S. complained of vomiting, hives and the inability to sleep. She told Lefkovitch that she was under stress because she had marital problems, lost her home and had to nurse her father after he was diagnosed with cancer. Lefkovitch ordered blood tests, and H.S. made a follow-up appointment with him. Lefkovitch did not tell her there would be a pelvic, vaginal or anal examination at the follow-up appointment.

When H.S. arrived for the follow-up appointment, the nurse took her into an examination room and left her there alone. H.S. sat in a chair because the examination table was not covered with paper. Lefkovitch came into the room alone and shut the door.

Lefkovitch asked H.S. if she had any hives. She said she did not. Nevertheless, Lefkovitch asked her to pull down her pants so he could look at her legs. She told him she did not have hives on her legs. He said he still wanted to look. She pulled down her pants. He looked between and on the sides of her legs. Then he told her to turn around and bend down. She complied. He grabbed her hips and buttocks. "[H]is hands were all over" her. She stood up because it felt awkward.

Lefkovitch asked H.S. if her kidneys were hurting and asked about vomiting and diarrhea. She said she no longer had vomiting or diarrhea.

2

Lefkovitch told H.S. to lie down on the examination table so that he could examine her pelvic area. She complied even though there was no paper on the table. He pulled down her underwear. He did not get gloves. He put his left hand on her hip and inserted two fingers of his right hand into her vagina. He kept his fingers in her vagina for a few seconds.

Lefkovitch inserted his fingers into her vagina a second time. It did not feel like a medical examination. Lefkovitch handled her roughly and hurt her a lot. At this point, H.S. realized Lefkovitch was not wearing gloves. She could feel his thumb on her skin and he was rubbing her clitoris. She told him to stop, and he stopped after two or three seconds. H.S. noticed Lefkovitch was sweating and shaking and his face was blushed.

Lefkovitch got a glove and aggressively shoved his fingers into H.S.'s anus. She told him it hurt. He apologized. H.S. asked Lefkovitch why he did the anal exam. He told her, "I just wanted to make sure you are okay, and you said you had diarrhea." H.S. replied, "No. I told you I didn't have diarrhea, and I haven't been vomiting for a few weeks now."

Lefkovitch stayed with H.S. as she got dressed. When she was dressed, Lefkovitch apologized and giggled. H.S. was shocked, frightened, embarrassed and disgusted. She told Lefkovitch that he did not even review her blood test results with her. He said her vitamin D level was low.

When H.S. got to her car she was crying. She texted her sister that something really bad had happened to her. She drove to her sister's home. She curled up in a corner of her sister's living room, crying and screaming hysterically. Eventually, H.S. was able to tell her sister that the doctor had raped her. H.S. contacted a friend who worked at the Simi Valley courthouse. The friend put her in contact with the police.

Sergeant Jason Robarts of the Ventura County Sheriff's office began an investigation the same day as the medical examination. H.S. told Robarts what had happened. H.S. agreed to an examination by a forensic nurse.

3

Forensic nurse, Deanna McCormick, saw redness and bruising in H.S.'s genital area without the need for visual aids. The type of redness H.S. had is commonly caused by contact with another object. McCormick also saw bruising of H.S.'s rectal tissue. McCormick had never seen bruising that bad. H.S.'s injuries were consistent with the history she provided to McCormick. McCormick testified that a regular pelvic, vaginal or anal examination would not have caused the injuries she saw.

Robarts asked H.S. to participate in pretextual telephone calls. Reluctant at first, she eventually agreed. Robarts recorded the calls.

H.S. made the first call two days after H.S. visited Lefkovitch's office. At the start of the call, H.S. told Lefkovitch she was calling in regard to the appointment she had. The conversation continued as follows:

"[H.S.]: Yeah, I, uh, it's just been on my mind, um, it's not a big deal, but I just felt a little uncomfortable the other day.

"[Lefkovitch]: Yeah, I know, and I, I, um, was going to actually call you and, to, um, just to apologize. It was, um, uh, I was, uh, I don't know what, uh, what came over me. I apologize. Just, uh, if you can forgive me and just not think -- not to make anything of it.

"[H.S.]: What do you mean, what came over you?

"[Lefkovitch]: I don't know. I don't know, it was like, uh, I-I-I don't know to tell you the truth. I really don't know. It was kind of just, weird. I don't know.

"[H.S.]: What did you feel, uh?

"[Lefkovitch]: Um., I would rather not to talk about it over the phone, but, um, there were just kind of weird f--, just, uh, I don't know, somethin' came over me.

"[H.S.]: Well, I would like to talk about it, so I can feel a little better.

"[Lefkovitch]: Sure.

"[H.S.]: I mean, it's not a big deal, um --

"[Lefkovitch]: Good, I was --

"[H.S.]: -- and thank you for apologizing.

4

"[Lefkovitch]: Yeah, I, I was, I, I, I was, I've been meaning to call you. I'm glad you called, uh, but like I said, I prefer, you know, talking to you in person, if that's okay."

H.S. said she had to pick up her daughter. Lefkovitch said he would call her back. He called back later that day. Their conversation was as follows:

"[Lefkovitch]: Um, I just, you know, found you attractive, that's all. So I, I apologize if, um, if I, um, you know, made you feel uncomfortable.

"[H.S.]: Oh, um, thank you for apologizing. I just, um, I wasn't sure, like I had mixed emotions and I wasn't really sure, uh, --

"[Lefkovitch]: That's fine.

"[H.S.]: -- how to take it, and then, you know, you weren't wearing a glove when, when you, um, were touching me at the beginning, so --

"[Lefkovitch]: um-hum.

"[H.S.]: I, I took it like personal.

"[Lefkovitch]: Um - hum. I, I understand.

"[H.S.]: So, um, I uh, and I didn't know how you -- what you were thinking or how you felt, and like --

"[Lefkovitch]: Hah.

"[H.S.]: -- I found, I find you attractive, too.

"[Lefkovitch]: Well, thank you. I find you extremely attractive, too.

"[H.S.]: Thank you.

"[Lefkovitch]: --and I just didn't, um, I was like, a lot of things just going through my head and I was like, I, I just, I should have said something to you and I, I, you know, whatever. [¶] . . . [¶]

"[H.S.]: Okay, Um, I, I still want to keep seeing you, I --

"[Lefkovitch]: Good, I hope I, I didn't want to, I didn't want you to feel uncomfortable and ruin our relationship --

"[H.S.]: Okay.

5

"[Lefkovitch]:  -- as a physician, you know.  But hopefully -- we can still be friends -- be friends, too.

"[H.S.]:  Um, yeah, 'cause when you weren't wearing the glove and you were feeling me, I, um, i-i-it kind of felt good and, but I, you know, it was -- kinda personal.

"[Lefkovitch]:  Um-hum.  [¶] . . . [¶]

"[H.S.]:  Um, then I noticed, like, the way you were looking at me was different.  [¶] . . . [¶]

"[Lefkovitch]: . . .  Um, you can tell, huh?

"[H.S.]:  Huh?

"[Lefkovitch]:  I said you could tell.

"[H.S.]:  Yeah, but it's not a big deal, I just wanted to make sure that, um, because I felt, uh, uh, embarrassed to, um, --

"[Lefkovitch]:  Say anything?

"[H.S.]:  Yeah.

"[Lefkovitch]:  Well I'm glad you --

"[H.S.]:  But it kind of felt good, and then, um, but when it started hurting, I, then I asked you to stop, and I was, like, holding your hand hard.  I just, you know.

"[Lefkovitch]:  Believe me, I did not want to hurt you.  That was not my intent at all.  [¶] . . . [¶]

"[H.S.]:  Hmm.  Um, anyway I'm feeling kinda stupid.  I, I, -- that you could have turned me on.  Um, did I turn you on?

"[Lefkovitch]:  Absolutely.  Still do."

Five days later, H.S. made a third recorded telephone call to Lefkovitch. The conversation was as follows:

"[H.S.]:  Um, so you know, I was just thinking, um, it, it's been on my mind.  Like the other day was just like flattering how you complimented me and --

"[Lefkovitch]:  Uh-huh.

6

"[H.S.]:  -- You said that I was attractive.  Um, --

"[Lefkovitch]:  Correct.

"[H.S.]:  So, uh, I don't know, I, I wasn't sure if like -- you remember how you said like you were just trying to make me feel good.  You didn't mean to hurt me.  Um, well like I appreciate that, but I was just like thinking if, you know, like wearing the glove were you just -- like not wearing your gloves was just trying to feel me and make me feel good?

"[Lefkovitch]:  Uh-huh.  Yeah.

"[H.S.]:  Okay.  Well, I mean it felt good --

"[Lefkovitch]:  (unintelligible)

"[H.S.]:  -- but I was just wondering like if it was something that you wanted to do.

"[Lefkovitch]:  Oh yes.  I definitely wanted to do it.

"[H.S.]:  Oh, okay.  Um, oh -- All right.  It was just like I-I, I just thought that it wasn't -- I-I mean I wasn't -- I didn't have any idea like what was happening.  Like it was just, um, -- I mean it felt good.  Um, --

"[Lefkovitch]:  Uh-huh.  I caught you by surprise, huh?

"[H.S.]:  Yeah.  Until you did the rectal thing.  It kind of hurt.

"[Lefkovitch]:  I'm sorry.  I, I -- it was, uh, -- well I -- it needed to be done for just for safety sake of yearly exam, but I sh--, -- I could've, I could have waited.  And I'm sorry."

Lefkovitch invited H.S. to meet him at his office on Sunday.  The conversation continued:

"[H.S.]:  I'll think about it.  So, um, I don't know, um, like, um, so did you get, um, -- like were you trying to like do those exams because I, um, you were turned on by me?

"[Lefkovitch]:  Yeah.

"[H.S.]:  Yeah.

7

"[Lefkovitch]:  I was very, very turned on by you.

"[H.S.]:  Okay.  Um, it was, it, it was just like flattering 'cause I didn't think I was like that attractive to you.

"[Lefkovitch]:  Are you kidding?  I've had the hots for you since, uh, day one."

Doctor Michelle Bholat testified there was no documentation in H.S.'s medical records that a pelvic, vaginal or anal examination was conducted.  She said if such an exam was conducted she would expect to see documentation.  She also testified there is nothing in H.S.'s medical records that would warrant such an exam.

*Victim D.B. - count 5 (misdemeanor sexual exploitation of a patient)*
*and count 6 (felony sexual exploitation of multiple patients)*

Lefkovitch was D.B.'s primary care physician.  One day, while she was in Lefkovitch's office, he asked if he could kiss her.  She said yes.  Over time, she fell in love with Lefkovitch.  They engaged in oral vaginal and anal sex in Lefkovitch's office and examination rooms.  The sex acts occurred during and after business hours and on multiple occasions during D.B.'s medical appointments.

D.B. participated in a recorded pretext telephone call to Lefkovitch.  D.B. asked him if the police knew about the sex.  Lefkovitch said they did not.  He told D.B. that it was a good time for her to go on vacation; he would pay for the trip.  He said to tell the police absolutely nothing.

*Victim M.B. -count 6 (felony sexual exploitation of multiple patients)*

M.B. was hired by Arroyo Oaks as a medical assistant.  The office manager wanted to fire her because she made a mistake.  Lefkovitch saved her job.  M.B. felt indebted to Lefkovitch.  A few months later she became his patient.  He gave her free medical care.  She had no insurance.

During a medical appointment Lefkovitch grabbed M.B.'s face and kissed her.  She spun around and told him that he could not do that.  After the exam, he groped her waist, crotch, buttocks and breast.  She protested every time he touched her.  She

8

pushed him away. He touched her inappropriately on other occasions. She told a friend that he approached her inappropriately every couple of weeks. She tried to remain on friendly terms because she had conditions requiring treatment and no medical insurance.

*Prior Acts*

L.F. was Lefkovitch's patient. At the end of an appointment Lefkovitch grabbed her head with one hand and put his tongue in her mouth. With his other hand he pulled her toward his body. She could feel his erection in her stomach. She pulled away and told him never to do that again.

C.R. began a preceptorship under Lefkovitch while she was training to work as a physician's assistant. Five or six months after C.R. began, her relationship with Lefkovitch became sexual. The sexual relationship lasted for a few months.

*Defense*

Employees of Arroyo Oaks testified they never saw Lefkovitch behave inappropriately. His office door was always open. Employees saw M.B. initiate hugging Lefkovitch. One employee attended a pharmaceutical representative dinner with M.B. and Lefkovitch. After the dinner, M.B. pulled Lefkovitch into the back seat of a car. The employee heard kissing and the rustling of clothes.

H.S.'s former physician testified she is prone to hypochondriasis, exaggeration and flirtation. But he also testified she is honest.

Lefkovitch's colleagues and patients testified he is an honest and caring physician.

DNA expert Mark Taylor testified that if a male inserted ungloved fingers into a vagina, moved the fingers for several seconds and reinserted the fingers for several seconds, it would be very likely male DNA cells would be left behind. No male cells were found on a swab of H.S.'s vagina. Taylor admitted, however, that he did not personally participate in the testing; that humans do not always leave DNA; and that if the male had just washed his hands or if his hands were very dry, no DNA may transfer.

9

Cari Caruso is a forensic sexual assault nurse. She testified she reviewed the work of the forensic nurse who examined H.S., including photographs and physical findings. Caruso did not see any significant redness or bruising of H.S.'s vagina or anus.

Doctor Richard Johnson testified that given H.S.'s medical history, it would be within the standard of care for a doctor to perform a pelvic exam. Johnson admitted, however, that if a pelvic exam is performed it would be important to note the results even if they are normal. But not everything gets into the record.

## DISCUSSION

### I.

Lefkovitch contends he was denied due process, his right to confrontation and the opportunity to present a defense by the application of section 1203.4.

Section 1203.4, subdivision (a)(1) provides in part: "In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, . . . the defendant shall . . . be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty . . . and . . . the court shall thereupon dismiss the accusations or information against the defendant and . . . he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted[.]"

H.S. committed a theft of clothing from a department store on January 4, 2007. She pled no contest to misdemeanor grand theft on March 29, 2007. The conviction was expunged on April 7, 2010.

During trial on cross-examination of H.S., defense counsel asked about a question on a job application H.S. filled out in 2009. The question on the application was whether she had been convicted of a crime. The prosecutor objected. The court held a hearing outside the presence of the jury.

At the hearing, defense counsel said he wanted to impeach H.S. for not truthfully filling out the job application. She checked "no" to the question whether she had ever been convicted of a crime. H.S. testified pursuant to Evidence Code

10

section section 402. She said she checked "no" on the advice of her attorney because her conviction had been expunged. She believed she truthfully filled out her application. The trial court excluded the evidence under Evidence Code section 352. The court noted that allowing the evidence would lead to additional witnesses, perhaps her former attorney. The court found that its probative value is substantially outweighed by an undue consumption of time.

The matter of H.S.'s prior conviction was next raised in Lefkovitch's motion for a new trial. Lefkovitch accused the prosecution of a *Brady* violation (*Brady v. Maryland* (1963) 373 U.S. 83) for failure to disclose the police report attendant to H.S.'s arrest. The report stated H.S. said she put some clothes in a shopping bag at Macy's in retaliation for a sales clerk being rude to her. She knew that store security was watching her. She said she intended to leave the clothes outside the entrance doors and not take them home. Lefkovitch claimed her statement to the police about her motive was so absurd it shows she not only stole but lied to the police about her motive.

A *Brady* violation involves the prosecution's suppression of evidence favorable to the accused where the evidence is material to guilt or punishment, irrespective of the prosecution's good or bad faith. (*Brady v. Maryland*, *supra*, 373 U.S. at p. 87.)

In ruling on Lefkovitch's motion, the court stated the parties agree that a *Brady* violation requires three elements. The court found the first element, that the evidence was favorable to the defendant, had been met. The court found that the second element, that the evidence had been suppressed, had not been met. The court stated that because the second element had not been met, there was no reason to consider the third element. Nevertheless, the court found the third element, materiality of the evidence, had not been met. The court stated that because H.S.'s conviction had been expunged under section 1203.4, it could not be used to impeach her credibility.

Lefkovitch does not challenge the trial court's exclusion of evidence under Evidence Code section 352. Nor does he challenge the trial court's finding that there is

11

no *Brady* violation because the prosecution did not suppress evidence. Instead, he challenges only the trial court's determination that there is no *Brady* violation because the evidence is immaterial, H.S.'s expunged conviction not being available to impeach her.

Lefkovitch argues the trial court erred in relying on *People v. Mackey* (1922) 58 Cal.App. 123 and *People v. Field* (1995) 31 Cal.App.4th 1778. Those cases hold that an expunged conviction cannot be used to impeach the credibility of a witness.

Lefkovitch argues that *Mackey* and *Field* do not conform to our Supreme Court's analysis in *People v. Vasquez* (2001) 25 Cal.4th 1225. *Vasquez* concerned a proceeding in which the defendant was found to be a sexually violent predator. (Welf. & Inst. Code, § 6600 et seq.) The trial court allowed the prosecutor to introduce evidence that the defendant had been convicted of a Texas offense that had been vacated under a Texas law similar to section 1203.4. The evidence was introduced to show that the defendant had been convicted of sexually violent offenses against two or more victims, as required by Welfare and Institutions Code section 6600, subd. (a). In concluding the evidence was admissible the court said: "Our courts have drawn a distinction between penalties imposed on a felon as further punishment for the crime, as to which vacation under Penal Code section 1203.4 generally affords relief, and nonpenal restrictions adopted for protection of public safety and welfare." (*People v. Vasquez*, *supra*, at p. 1230.) The court also pointed out the purpose of the Sexually Violent Predator Act is to provide treatment, not punishment. (*Id.*, at pp. 1231-1232.)

It is one thing to use an expunged conviction in an attempt to provide a benefit for the person whose conviction has been expunged. It is quite another thing to use an expunged conviction against the person whose conviction has been expunged. Thus *Vasquez* can be distinguished from *Mackey* and *Field*.

Evidence Code section 788 provides in part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless: [¶] . . . [¶] (c) The accusatory pleading against the witness has been dismissed under the provisions of Penal

12

Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense."

By its terms, Evidence Code section 788, subdivision (c) applies only to a felony. But it clearly states a public policy that an expunged conviction should not be used to impeach the credibility of a witness. It would be absurd to conclude that an expunged felony conviction cannot be used to impeach a witness, but that an expunged misdemeanor conviction can.

Lefkovitch argues that if section 1203.4 is interpreted to prohibit the use of an expunged conviction to impeach a witness, the section is unconstitutional. He claims it denies him the right to present a complete defense in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

We need not decide the constitutional question. Even assuming the trial court erred in concluding section 1203.4 prohibits the admission into evidence of an expunged conviction, the error is harmless by any standard.

First, the trial court did not exclude any evidence pursuant to section 1203.4. Section 1203.4 was raised in the context of a motion for a new trial alleging a *Brady* violation. The trial court's conclusion that the prosecution did not suppress any evidence, rendered the court's further conclusion that section 1203.4 prohibited admission of the evidence, mere surplusage. Second, whatever impeachment value the conviction and related evidence may have had is inconsequential in comparison to evidence corroborating H.S.'s testimony.

The conviction is for misdemeanor theft. It is not for a felony. Nor is it for perjury or for filing a false police report accusing another of a sex crime. The conviction is for an offense that occurred more than five years prior to trial. H.S. has had no convictions before and has had none since. Even if she lied to the police about her motive for the theft, at most the incident involves one bad day in an otherwise law abiding and honest life. It does not show a pattern of continuing dishonesty. Moreover, H.S.'s testimony was well corroborated by other evidence. That evidence included the

13

results of an examination of H.S. by forensic nurse Deanna McCormick, the testimony of other patients about sexual improprieties committed by Lefkovitch, and most telling of all, recorded telephone conversations between H.S. and Lefkovitch. Any reasonable juror would conclude from those conversations that Lefkovitch sexually assaulted H.S. Any error was harmless beyond a reasonable doubt.

II.

Lefkovitch contends the misdemeanor conviction on count 5, sexual exploitation of a patient, must be stricken as a lesser included offense of count 6, felony sexual exploitation of two or more patients.

If the statutory elements of the greater offense include all the statutory elements of the lesser offense, the later is necessarily included in the former. (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) Where the defendant is found guilty of both the greater and the lesser necessarily included offense, based on the same act or course of conduct, the lesser offense must be reversed. (*Ibid.*)

Business and Professions Code section 729, subdivision (a) provides that a physician who engages in an act of sexual intercourse, sodomy, oral copulation or sexual contact with a patient is guilty of sexual exploitation. Subdivision (b)(1), (b)(2) and (b)(3) of the section provide:

"(1) An act in violation of subdivision (a) shall be punishable by imprisonment in a county jail for a period of not more than six months, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

"(2) Multiple acts in violation of subdivision (a) with a single victim, when the offender has no prior conviction for sexual exploitation, shall be punishable by imprisonment in a county jail for a period of not more than six months, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

"(3) An act or acts in violation of subdivision (a) with two or more victims shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, and a fine not exceeding

14

ten thousand dollars ($10,000); or the act or acts shall be punishable by imprisonment in a county jail for a period of not more than one year, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine."

The People do not contest that count 5 includes all the statutory elements of count 6. The only question is whether Lefkovitch's convictions on both counts is based on the same act or course of conduct.

The prosecutor told the jury that count 5 is based on Lefkovitch's sexual exploitation of patient D.B. The People argue that evidence of sexual exploitation of two other patients, H.S. and M.B. support the conviction on count 6.

Indeed, the jury may have based its guilty verdict on count 6 on evidence of the sexual exploitation of H.S. and M.B. But the People point to nothing in the record to show the jury did in fact base its verdict on count 6 on such evidence.

A defendant is entitled to a determination of guilt by a unanimous jury on proof beyond a reasonable doubt. (*People v. Coelho* (2001) 89 Cal.App.4th 861, 874-875.) Accordingly, where the prosecutor presents evidence of more than one unlawful act for a given charge, the jury must unanimously agree on the particular unlawful act that forms the basis for each conviction. (*Id.* at p. 875.) In sentencing, the trial court must rely on the same factual basis that the jury relied on to convict the defendant on that particular count. (*Id.* at p. 876.) Where it is unclear which act applies to which conviction, the trial court must give the defendant the benefit of a reasonable doubt. (*Id.* at p. 885.)

Here it cannot be said beyond a reasonable doubt that the jury's verdict on count 6 was based on the sexual exploitation of M.B. It may well have been based on the sexual exploitation of H.S. and D.B. alone. Thus we must reverse count 5 as a lesser included offense of count 6.

Lefkovitch contends the concurrent two-year term imposed on count 6 must be stayed pursuant to section 654. He argues that count 6 is based on the same acts as counts 1, 2, 3 and 5. Our reversal of count 5 makes the argument moot.

15

We reverse count 5 as a lesser included offense of count 6. We direct the superior court clerk to amend the abstract of judgment accordingly and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

Ryan J. Wright, Judge

Superior Court County of Ventura
_____

Susan Pochter Stone, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Timothy M. Weiner, Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.