Filed 12/27/21  P. v. Ruiz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EDDIE RUIZ,<br><br>    Defendant and Appellant. | G060381<br><br>(Super. Ct. No. C1648496)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Santa Clara County, Julia L. Alloggiamento, Judge.  Affirmed.

Cliff Gardner and Brooke Acevedo for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin and Bruce M. Slavin, Deputy Attorneys General, for Plaintiff and Respondent.

Eddie Ruiz appeals from a judgment after a jury convicted him of first degree murder and being a misdemeanant in possession of a firearm and found true he personally used a firearm. Ruiz argues he received ineffective assistance of counsel, the trial court erred in instructing the jury, and there was cumulative error. None of his contentions have merit, and we affirm the judgment.

FACTS

*I. Substantive Facts*

Kiahra C. and her husband, Christopher D., went to First Street and Willow Street in San Jose for Kiahra to work as a prostitute. Christopher sat nearby in their car, which was parked at a laundromat, while Kiahra walked on First Street.

David M. propositioned Kiahra. They walked to his car—David sat in the driver's seat, and Kiahra sat in the passenger's seat. David put the key in the ignition, and they talked.

Minutes later, the driver's side door opened, and the car's interior lights illuminated. Kiahra leaned forward and saw a man wearing a black jacket and black gloves; she thought he was a police officer.

The man asked David for his identification. David said they had not done anything wrong. Kiahra became suspicious the man was not an officer and asked him what was wrong. The man asked Kiahra to wait a moment and continued to ask for David for his identification.

As David produced his wallet, he asked the man to see his badge. The man grabbed the wallet, and after a brief struggle over the wallet, he ran away. David chased the man. Kiahra got out but stayed next to the car.

With David in pursuit, the man turned and shot him. The man ran towards the corner, walked when he saw David was not following him, and ran across the street towards the laundromat. David turned around and walked towards Kiahra while holding

2

his chest.  David collapsed in the parking lot, and Kiahra ran to him before going to get help.

Christopher heard a loud noise and got out of the car.  He saw a man, who appeared scared and panicked, run by him.  The man was wearing a dark leather jacket.

Kiahra spoke to the 911 dispatcher as the police arrived.  She described the man as a Caucasian male in his 20s wearing a black suede jacket and black gloves.  She did not tell the dispatcher she was working as a prostitute because she did not want to get into trouble.

Officer Ivan Barragan responded to the scene and performed CPR on David, who was holding his identification.  The paramedics arrived and pronounced him dead.  David's wallet was on the ground near his car.

Officer Michael Alvarez looked for casings in the area but did not find any.  Later, a bullet was recovered from David's body.

Officers interviewed four people at the scene.  All described what the man was wearing but none could identify him.

Detectives Wayne Smith and Brian McDonald arrived at the scene, obtained surveillance video from six nearby businesses, and interviewed witnesses.  Christopher told the detectives that he thought he could identify the man and described him to a police sketch artist.

Smith identified a suspect in all but one of the surveillance videos.  Weeks passed without identifying the suspect.  Smith arranged the release of the surveillance video from two businesses to obtain the public's help in identifying the suspect.

The following week, Vanessa G. called the San Jose Police Department and identified the suspect as Ruiz.  Smith found a photograph of Ruiz wearing a shirt similar to the one in the video.  He obtained Ruiz's address and cell phone number and wrote a search warrant for his cell phone records.

3

Smith prepared a six-pack photographic lineup using Ruiz's driver's license photograph because his hair length was similar to the suspect's hair length.

Eight weeks after the shooting, Smith showed the photographic lineup to Christopher. He was unable to positively identify anyone, but he selected photograph No. 2, Ruiz, as the person who most "close[ly]" resembled the man. He said the man was wearing a black leather jacket and a black baseball hat.

Almost 10 weeks after the shooting, Smith showed the photographic lineup to Kiahra. Smith moved Ruiz's photograph from position No. 2 to position No. 3. Kiahra positively identified photograph No. 3, Ruiz, as the shooter.[1] At one point, Kiahra could not decide between photograph Nos. 3 and 5 and said "I know I can't ask you guys' opinion." After McDonald showed her surveillance video, Kiahra said the man shown in the video was the man in photograph No. 3. When asked who the man in the video was, Kiahra answered the shooter and added the man who robbed David. She said the man was wearing all black, pants, jacket, hat, shoes, and gloves. She saw the man earlier that evening but he was carrying the jacket. Near the end of the interview, Kiahra asked, "[D]oes that person look that, like that person, the person that I can . . . ." McDonald said they could not answer that.

Police officers arrested Ruiz a few days later. Officers searched Ruiz's home, a little less than a mile from the location of the shooting, and found black high-top shoes, a baseball hat, a black leather jacket, black and clear latex gloves, and multiple pairs of black pants. Officers also searched Ruiz's parents' house and found a loaded firearm. Detectives eliminated two men as suspects who were identified by anonymous callers.

---

[1] The prosecutor played video recordings of Kiahra's and Christopher's interviews for the jury.

4

*II. Procedural Facts*

An information charged Ruiz with the following: murder (Pen. Code, § 187, all further statutory references are to the Penal Code, unless otherwise indicated) (count 1); and being a misdemeanant in possession of a firearm (§ 29805) (count 2). As to count 1, the information alleged the robbery special circumstance (§ 190.2, subd. (a)(17)), and the personal use of a firearm enhancement (§ 12022.53, subd. (d)). Kiahra testified at the preliminary hearing in January 2018 and identified Ruiz as the shooter. Ruiz was held to answer.

In his motions in limine (August 6, 2018), the prosecution disclosed that after the shooting (July 28, 2016), Kiahra was cited on September 12, 2017, and arrested on May 10, 2018, for loitering with the intent to commit prostitution. The prosecution explained that another prosecutor in the office declined to file charges in either case due to insufficient evidence. That prosecutor declined to file charges on the May 10, 2018, incident on July 9, 2018, and on the September 12, 2017, incident on August 1, 2018. The prosecutor noted there was a pending Sacramento County case against Kiahra for loitering with the intent to commit prostitution (October 13, 2017). The prosecutor requested the trial court rule on the admissibility of this evidence if Ruiz sought to impeach Kiahra. The prosecution included the police report from the September 12, 2017, incident as an exhibit. The report indicated she told the arresting officer "she had been a witness in a violent crime in San Jose that involved prostitution approximately a year before."

At an Evidence Code section 402 hearing (August 8, 2018), Ruiz's trial counsel stated she did not intend to impeach Kiahra with the citations. Counsel stated she intended to question Kiahra about how "that would just go to her ability to perceive or what was on her mind." Counsel added, "But in terms of whether or not it shows a willingness to lie or goes to her credibility, I don't plan on asking her any questions of

5

that nature." Counsel concluded she might seek to revisit the issue depending on how Kiahra's testimony went.

At trial on August 15, 2018, Kiahra testified she was "[v]ery confident" Ruiz was the man who shot David "because [she could not] get his face out of [her] head." When the prosecutor asked her whether she had any doubt, Kiahra answered, "No." She again described what the man was wearing—"black leather jacket and gloves and hat[]" and black pants. Kiahra said she saw Ruiz about 30 minutes earlier walking on the opposite side of the street from her. The prosecutor again asked Kiahra whether she had any doubt Ruiz was the man who shot David. Kiahra responded, "I'm positive."

During cross-examination, Ruiz's trial counsel questioned Kiahra about her truthfulness to police officers and how well she perceived the man who robbed and shot David. Counsel asked Kiahra whether she told officers, "'He's standing up, and, you know, I'm in a car sitting down.'" She said, "Yes." But Kiahra denied she told officers she did not "'see his face.'" After repeated questions and having her recollection refreshed with a transcript of her conversation with officers, she agreed she told officers, "It happened so fast." When counsel refreshed her recollection again, Kiahra agreed she told officers that one of the most distinguishing things about the shooter was his gloves, but it was not the only thing.

On redirect examination, the prosecutor asked Kiahra whether he had offered her any deals on any criminal case in exchange for her testimony. She answered, "No." When the prosecutor asked Kiahra whether she was positive Ruiz was the man who shot David, she answered, "Yes."

Christopher identified Ruiz as the man who ran past him. He was "90 percent sure." On cross-examination, Ruiz's trial counsel questioned Christopher about whether the suspect ran or walked by Christopher and whether he stopped.

Video surveillance from before the shooting showed the suspect walking south on First Street. The video from after the shooting showed the suspect running north

6

on First Street in the direction of Ruiz's residence. Video surveillance also showed the suspect running near where Christopher was standing.

An expert in cell phone site analysis testified Ruiz's cell phone was in the vicinity of the homicide at about the time it occurred, but the area covered by that tower also included Ruiz's residence.

A firearms' expert testified she examined the firearm recovered from Ruiz's parents' home and the bullet recovered from David. She could not tell whether the gun fired the bullet.

The prosecutor offered the testimony of five witnesses who, when shown surveillance video, said it was or looked like Ruiz. Four of them testified Ruiz said he owned a .38 special handgun or a handgun, and shot a pistol at his grandfather's house. One of them testified that about the time of the shooting Ruiz said he needed his paycheck to pay rent. Another one of them, Ruiz's employer, testified he missed work the day of the shooting and the following day.

Ruiz offered the testimony of Dr. Kathy Pezdek, an eyewitness identification and cognitive science expert, who reviewed the case file in this case. Pezdek stated there were 10 factors relevant to the identification in this case: distance and lighting; exposure time; stress; disguises; cross-racial identification; time delay between the event and the identification; whether the identification was immediate or made by a process of elimination; whether there was a double-blind procedure; whether there was identification confirmation; and the bias inherent in an in-court identification. Pezdek explained how each of these factors undermined the identification. She opined that if a witness only saw a person for a short period of time it is unlikely the witness could identify the person nine weeks later. When Ruiz's trial counsel asked about certainty, Pezdek stated the following: "When eyewitnesses express certainty or their confidence is indicative of how likely they are to be correct at the time when they make the identification. Not at the preliminary hearing, not at the trial, not a long time

7

afterwards. But at the initial identification, photographic lineup in your hypothetical, a witness's expressed certainty is indicative of accuracy. If she picks him out, like I said before, fast and confident is more likely to be correct. And so in that case, you know, if she expresses questions like 'Did I pick the right person?' or something like that, that's a low level of confidence." The expert stated she watched the video recording of the detectives' interview of Kiahra and she asked whether she picked the correct person.

Ruiz's cell phone forensics expert testified that at the time of the shooting, Ruiz's cell phone could have been at the location of the shooting, at his residence, or anywhere else within the cell tower's sector.

During closing argument, the prosecutor stated the only issue the jury had to decide was whether Ruiz was the man who shot David. The prosecutor said surveillance videos showed Ruiz was in the area of the shooting. The prosecutor repeatedly stated Kiahra was positive Ruiz was the man who shot David. The prosecutor said the defense had not presented any evidence Kiahra had a motive to lie and falsely identify Ruiz as the shooter. Ruiz's trial counsel objected and there was an unreported discussion. Back on the record, the trial court overruled counsel's objection.

Ruiz's trial counsel agreed with the prosecutor regarding the dispositive issue. Ruiz's trial counsel conceded Ruiz was the man shown in one of the surveillance videos dressed like he was going to a dance club in the area. Counsel argued Kiahra's and Christopher's identifications of Ruiz were completely unreliable and the prosecution's other evidence as to the shooter's identity was inconclusive.

In rebuttal, the prosecutor noted Ruiz's trial counsel conceded Ruiz was shown in one of the surveillance videos. He added the most damning evidence was that Kiahra identified Ruiz as the shooter from surveillance video that numerous other witnesses testified showed Ruiz.

Out of the jury's presence, the trial court allowed Ruiz's trial counsel to make a record of her objection. Counsel objected the prosecutor committed misconduct

8

by improperly vouching for Kiahra. The prosecutor disagreed, stating he was commenting on the evidence presented. The trial court interpreted the prosecutor's comment as one based on the lack of any evidence Kiahra had a motive to lie. Ruiz's trial counsel stated, "[T]he prosecutor made a motion to preclude me from going into . . . evidence . . . [Kiahra] ha[d] pending prostitution citations, and so that's why I had a particular concern about trying to do anything with regards to her credibility when we knew there was evidence out there that might suggest that I'd been precluded from getting into it." The court responded its recollection was counsel did not intend to question Kiahra about pending prostitution charges. The court said, "I don't think it was specifically seeking something the [c]ourt precluded." The court wanted "to keep the record clear on that[.]"

The jury convicted Ruiz of both counts and found true the robbery special circumstance and firearm allegation. The trial court sentenced Ruiz to three years on count 2 and life without the possibility of parole plus 25 years on count 1.

## DISCUSSION

### I. Ineffective Assistance of Counsel

Ruiz argues his trial counsel was ineffective for failing to question Kiahra about whether she had a motive to lie, i.e., the dismissed and pending misdemeanor loitering with the intent to commit prostitution cases. Any error was harmless.

"To obtain relief, he 'must prove "'that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'"' [Citation.] A reasonable probability, the high court has said, 'is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*In re Champion* (2014) 58 Cal.4th 965, 1007.) "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the

9

defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' [Citation.]" (*Ibid.*)

"'[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case.' [Citation.] 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citation.] Therefore, all [a defendant] must show "is that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jones* (2010) 186 Cal.App.4th 216, 244 (*Jones*), fn. omitted.)

Here, it is not reasonably probable the result of the proceeding would have been different had Ruiz's trial counsel tried to undermine Kiahra's credibility with the three misdemeanor loitering with the intent to commit prostitution charges (misdemeanors). Although the photographic lineup was more than nine weeks after the incident, Kiahra positively identified Ruiz *before* the misdemeanors. After positively identifying Ruiz, she did express some uncertainty between photograph Nos. 3 and 5. When McDonald showed her surveillance video from the area, she positively identified the man in the video first as the man in photograph No. 3 and then as the man who shot and robbed David. Photograph No. 3 depicted Ruiz. This was nearly one year before the earliest misdemeanor offense. At this point, she had no motive to lie, and Ruiz does not contend otherwise.

We agree with Ruiz this case turned on Kiahra's credibility. The jury heard evidence Kiahra was a prostitute. Ruiz's trial counsel thoroughly cross-examined Kiahra about her identification. Counsel questioned Kiahra about her statement to police the incident happened so quick to cast doubt on how well she saw the suspect. Counsel also

10

questioned how she could have seen his face if she was seated in the passenger's side front seat and the suspect was standing at the driver's side. Counsel also questioned her about her statement the suspect's most distinctive feature was his gloves, again to cast doubt on how well she saw the suspect's face. Additionally, Pezdek offered detailed testimony that called into question the accuracy of Kiahra's identification. She explained an identification remote in time from the incident where the witness expresses uncertainty calls into question the identification.

Additionally, Christopher identified Ruiz in a photographic lineup as the person who most closely resembled the man who ran by him. Numerous witnesses, people who knew Ruiz, testified the person shown in surveillance video from around the time of the shooting was Ruiz or looked like Ruiz. Surveillance video also showed Ruiz walking towards where David and Kiahra were parked before the shooting and running away after the shooting. This evidence was so compelling that during closing argument Ruiz's trial counsel admitted Ruiz was the man in the video. Counsel argued however that Ruiz was a man dressed like he was going to the nearby dance club, not a police officer.

True, "It is long-standing law that a prosecution witness can be impeached by the mere fact of pending charges. [Citation.] Such a situation is a 'circumstance to show that he . . . may, by testifying, be seeking favor or leniency. [Citations.]' [Citation.] Although the charges pending . . . at the time constituted only misdemeanors, the conduct underlying those charges was admissible to impeach despite the lack of a conviction. [Citations.]" (*People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080-1081.)

The fact the same prosecutor's office dismissed two misdemeanors against Kiahra shortly before trial and she faced another misdemeanor in a neighboring county would not have undermined her credibility. This was not a case where she faced significant time in custody if she were convicted of these offenses. Contrary to Ruiz's contention, Kiahra did not have "a strong motive to cooperate with the [prosecution]."

11

She testified the prosecution did not offer her any deals on any criminal case in exchange for her testimony.  This is not a case where cross-examining Kiahra about the misdemeanors """"would have produced 'a significantly different impression of [Kiahra's] credibility.""""  [Citation.]"  (*People v. Dalton* (2019) 7 Cal.5th 166, 221.)  Our confidence in the outcome of the proceeding is not undermined by the fact Ruiz's trial counsel did not attempt to impeach Kiahra with the misdemeanors.  (*Jones, supra,* 186 Cal.App.4th at p. 244.)

## II.  *Jury Instructions*

Ruiz asserts the trial court erred in instructing the jury.  As we explain below, the court did not err, and thus, a harmless error analysis with respect to the three alleged errors is unnecessary.

## A.  *CALCRIM No. 315, "Eyewitness Identification"*

Ruiz contends the trial court erred by instructing the jury with CALCRIM No. 315's certainty factor.  The Attorney General answers Ruiz forfeited this contention, there was no error, and he was not prejudiced.  The court did not err.

Ruiz claims this contention is not forfeited because any objection would have been futile based on controlling law, the instruction affected his substantial rights, and his trial counsel was ineffective for failing to object.  Because Ruiz asserts ineffective assistance of counsel, we address the merits.  (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [court of appeal discretion to address issue party did not preserve]; *People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing claim's merits despite forfeiture because defendant asserted ineffective assistance of counsel].)

In *People v. Lemcke* (2021) 11 Cal.5th 644, 646 (*Lemcke*), our Supreme Court rejected a federal and state due process challenge to CALCRIM No. 315, the successor instruction to CALJIC No. 2.92.  In that case, the prosecution's theory rested on a single eyewitness (victim) who identified defendant as the perpetrator twice before trial during photographic lineups and at trial.  (*Id*. at pp. 648-650.)  The victim expressed

12

certainty in her identification. (*Id*. at pp. 649-650.) Defendant challenged the victim's identification both by calling an expert to testify about, inter alia, the weak correlation between certainty and accuracy and by cross-examining the victim. (*Id*. at pp. 650-652, 660.) In language essentially identical to CALCRIM No. 315, the trial court instructed the jury on 15 factors it should consider in evaluating the accuracy of an eyewitness identification, including how certain the witness was when she made the identification. (*Id*. at pp. 652, 654, fn. 5.) In closing argument, the prosecution focused on the victim's consistent identification and her certainty. (*Id*. at p. 652.) The jury convicted defendant, and the Court of Appeal rejected his due process challenge and affirmed. (*Id*. at p. 653.)

In rejecting defendant's due process challenges, the *Lemcke* court explained that "[w]hen considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [defendant's] trial fundamentally unfair. [Citations.]" (*Lemcke, supra,* 11 Cal.5th at pp. 646-647.) As to defendant's argument the certainty instruction lowered the prosecution's burden of proof, the court opined "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Id*. at p. 657.) The court noted defendant was permitted to present expert testimony to combat any inference that certainty correlates with accuracy and the trial court instructed the jury it must consider the expert's opinion (CALCRIM No. 332). (*Id*. at pp. 657-658.) The court

13

stated other instructions ensured the prosecutor's burden was not lowered (CALCRIM Nos. 220, 226, 315, & 332). (*Id.* at p. 658.)

The *Lemcke* court also rejected defendant's argument the certainty instruction deprived him of a meaningful opportunity to present a complete defense. (*Lemcke, supra,* 11 Cal.5th at pp. 660-661.) The court noted defendant was allowed to put on a vigorous defense on the issue of identity. (*Id.* at p. 660.) The court again cited to the eyewitness identification expert who testified as to the weak correlation between certainty and accuracy. (*Ibid.*) The court also stated defendant thoroughly cross-examined the victim regarding her identification. (*Ibid.*) The *Lemcke* court concluded listing witness certainty as one of 15 factors jurors should consider when evaluation an eyewitness's identification testimony did not amount to a due process violation. (*Id.* at p. 661.)

Although the *Lemcke* court affirmed defendant's conviction, it nevertheless acknowledged that CALCRIM No. 315 "has the potential to mislead jurors" given "the empirical research that '"under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy."' [Citations.]" (*Lemcke, supra,* 11 Cal.5th at p. 665.) The court stated, "That raises particular concerns in a case like this one, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant. [Citations.]" (*Id.* at p. 666.) The court requested the Judicial Council and its Advisory Committee on Criminal Jury Instructions evaluate whether or how the instruction might be modified and directed trial courts to omit the certainty factor from CALCRIM No. 315 unless a defendant requests otherwise. (*Id.* at pp. 647-648, 668-669.)

Based on *Lemcke*, CALCRIM No. 315's certainty of identification factor—"[h]ow certain was the witness when he or she made an identification?"—did not violate Ruiz's federal and state due process rights. As the *Lemcke* court stated, CALCRIM No. 315's certainty factor did not equate certainty with accuracy and did not require the jury

14

to presume an identification was accurate just because a witness expressed certainty. (*Lemcke, supra,* 11 Cal.5th at p. 657.) The certainty of identification factor was just one of 15 factors the court listed for the jury to consider when evaluating the truthfulness and accuracy of Kiahra's and Christopher's identification testimony. Additionally, like the *Lemcke* court, we must evaluate the entire charge to the jury. (*Lemcke, supra,* 11 Cal.5th at p. 658.)

The trial court here gave the jury instructions that undermine Ruiz's claim the certainty factor violated his due process rights. In fact, the court instructed the jury with the same instructions the *Lemcke* court relied on in finding no due process violation. The court instructed the jury Ruiz was presumed innocent and the prosecution bore the burden of proving all elements of the offenses beyond a reasonable doubt (CALCRIM No. 220). The court also instructed the jury that in evaluating witness testimony it "alone must judge the credibility or believability of the witnesses" and that "[p]eople sometimes honestly . . . make mistakes about what they remember" (CALCRIM No. 226). With respect to evaluating eyewitness identification testimony, the court instructed the jury, again, the prosecution had the burden of proving Ruiz guilty beyond a reasonable doubt and if it failed its burden the jury must find Ruiz not guilty (CALCRIM No. 315). Finally, the court instructed the jury it "must" consider Pezdek's testimony Kiahra's identification was unreliable (CALCRIM No. 332).

Moreover, like in *Lemcke*, the certainty factor did not prevent Ruiz from presenting a complete defense. The record before us establishes Ruiz presented a vigorous defense on the identity issue. Ruiz offered the testimony of an eyewitness identification expert who testified about certainty at the time of the initial identification. Pezdek opined that a witness's expressed certainty at the time of the initial identification is indicative of accuracy and if a witness asks whether she picked the correct person, there is "a low level of confidence[]" in the identification. Kiahra asked detectives whether she picked the correct person. It is true Pezdek's testimony on certainty was not

15

as exhaustive as the expert in *Lemcke*. But the jury had before it expert testimony, that it had to consider, that called into question the certainty of Kiahra's identification.

Additionally, Ruiz's trial counsel thoroughly cross-examined Kiahra, and to a lesser extent Christopher, about their identifications. Counsel questioned Kiahra about how quickly the suspect opened the driver's side door after they got into the car and how well she saw the suspect from the front passenger seat to show her identification was unreliable. Counsel elicited numerous inconsistencies between her statements to police and her testimony in an attempt to cast doubt on her identification. Counsel focused on the unreliability of both Kiahra's and Christopher's identifications during closing argument.

Ruiz cites to the *Lemcke's* court's statement the certainty factor was particularly concerning in cases where a single witness identifies a suspect with certainty and whom the witness does not know. We note the court made this comment in the section addressing reevaluating CALCRIM No. 315 for future cases. We also note, it did not carry the day in *Lemcke*, and it similarly does not carry the day here.

In conclusion, "when considered '"in the context of the instructions as a whole and the trial record"' [citations], we conclude that listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [Ruiz's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke, supra,* 11 Cal.5th at p. 661.)

## B. CALCRIM No. 359, "Corpus Delicti: Independent Evidence of a Charged Crime"

Relying on *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), Ruiz asserts the trial court erred by instructing the jury with CALCRIM No. 359 because identity was the central issue in the case. He claims that although "[n]one of [his] statements admitted guilt on any level[,]" the instruction, which prohibits reliance on a defendant's inculpatory out-of-court statements alone as proof that a crime occurred, but

16

allows such reliance to prove identity as the perpetrator, impermissibly lowered the prosecution's burden to prove identity beyond a reasonable doubt. Not so.

Without objection,[2] the trial court instructed the jury with CALCRIM No. 359 as follows: "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statement to convict him only if you first conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the defendant's statement alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

"'[T]he relevant inquiry here is whether, "in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice." [Citation.] Also, '""we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation].'"' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 95 (*Landry*).)

CALCRIM No. 359 sets forth the corpus delicti rule, which requires the prosecution to prove that a crime actually happened, apart from the defendant's out-of-court statement. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) The evidence of a crime may be slight and need not point to the defendant as the perpetrator. (*Ibid.*) The corpus delicti rule does not require independent proof the defendant was the perpetrator. (*Ibid.*) A defendant's inculpatory out-of-court statements may, however, be relied upon

---

[2]     We will address the merits of Ruiz's contention because we, like the Attorney General, acknowledge the *Rivas* court held the issue was not forfeited because the instruction affected defendant's fundamental rights. (*Rivas, supra,* 214 Cal.App.4th at p. 1421.)

to establish his or her identity as the perpetrator of a crime because the perpetrator's identity is not part of the corpus delicti. (*Ibid.*)

In *Rivas*, the trial court instructed the jury with an earlier version of CALCRIM No. 359 that stated, "'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.'" (*Rivas, supra,* 214 Cal.App.4th at p. 1428, fn. 5.) The *Rivas* court held this "identity" paragraph "requires reconsideration" because it "presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' [citation], which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Id.* at p. 1429.) The *Rivas* court distinguished this "identity" wording as "quite different" from the instruction our Supreme Court upheld in *People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*). (*Rivas, supra,* 214 Cal.App.4th at p. 1429, fn. 8.)

In *Foster*, the trial court instructed the jury "'[t]he identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. Such identity or degree of the crime may be established by an admission.'" (*Foster, supra,* 50 Cal.4th at p. 1344, fn. 19, italics omitted.) In *People v. Rosales* (2014) 222 Cal.App.4th 1254 (*Rosales*), the court disagreed with *Rivas* and held the "identity" language in former CALCRIM No. 359 correctly stated the law and created no reasonable likelihood of juror confusion. (*Rosales, supra,* 222 Cal.App.4th at pp. 1260-1261.)

We need not decide whether *Rivas* or *Rosales* is correct because the trial court here instructed the jury with a different version of CALCRIM No. 359 than was used in those cases—a version that was revised in response to *Rivas*. (Judicial Council of Cal., Crim. Jury Instns. (2019) Bench Notes to CALCRIM No. 359, p. 124.) This version

18

correctly states the law and is more akin to the instruction our Supreme Court upheld in *Foster* than to the earlier revision of CALCRIM No. 359 questioned in *Rivas* and upheld in *Rosale*s.  Thus, we conclude the court properly instructed the jury regarding the law and the instruction was not likely to confuse jurors.  Additionally, CALCRIM No. 359 did not lower the prosecution's burden of proof.  In fact, it expressly stated the prosecution must prove the defendant's guilt beyond a reasonable doubt.

Finally, we note Ruiz asserts his statements to co-workers that he had experience with firearms and had financial difficulties near the time of the offense did not establish his guilt and said "very little" about the shooter's identity.  We agree, which may be why the prosecutor did not rely on these statements to establish his identity.  Ruiz's acknowledgment his statements had little, if any, relevance on the issue of identity undermines his claim the statements were inculpatory.  The court also instructed the jury as follows:  "Some of these instructions may not apply depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts."  Because Ruiz's statements were not inculpatory on the issue of identity, we are confident the jury disregarded the instruction.  (*Landry, supra,* 2 Cal.5th at p. 95 [jurors are intelligent and capable of understanding instructions].)

C.  *CALCRIM No. 372, "Defendant's Flight"*

Ruiz argues "[t]he trial court violated [his] due process rights by giving jurors an unbalanced instruction on post-crime conduct telling jurors they could convict based on such conduct but not telling them they could acquit based on such conduct as well."  (Capitalization omitted.)  We disagree.

Without objection, the trial court instructed the jury with CALCRIM No. 372 as follows:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled,

19

it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Assuming without deciding this issue is preserved, there was no error. Two cases from our Supreme Court, which Ruiz does not discuss, dictate we reject his claim. In *People v. Green* (1980) 27 Cal.3d 1 (*Green*),[3] defendant argued the "trial court erred in refusing to give his proffered instruction the *absence* of flight by a suspect may be considered by the jury as circumstantial evidence that he had an innocent frame of mind." (*Id*. at p. 36, fn. omitted.) The court opined "the absence of flight is so ambiguous, so laden with conflicting interpretations, that its probative value on the issue of innocence is slight." (*Id*. at p. 39.) The Supreme Court concluded the trial court did not err by refusing to give the proffered instruction. (*Ibid*.)

In *People v. Staten* (2000) 24 Cal.4th 434 (*Staten*), the court again rejected the argument the trial court erred by failing to instruct the jury it might consider the absence of flight as a factor tending to show innocence. (*Id*. at p. 459.) The court held the lack of parity in the flight instruction did not violate due process. (*Ibid*.) The court clarified its conclusion in *Green* "also forecloses any federal or state constitutional challenge based on due process." (*Ibid*.) We are bound by our Supreme Court's holdings in *Green* and *Staten* the absence of flight instruction is proper and not unfair. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Ruiz's reliance on *Cool v. United States* (1972) 409 U.S. 100, is misplaced. In *Cool*, the Court concluded an accomplice instruction interfered with defendant's right to present a defense and lowered the prosecution's burden of proof. (*Id*. at p. 102.) *Cool* has nothing to do with CALCRIM No. 372 and does not control here.

---

[3] *Green* was overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 234.

*III. Cumulative Error*

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim, and the test is whether the defendant received a fair trial. (*Rivas, supra,* 214 Cal.App.4th at p. 1436.) *Ruiz's* cumulative error claim is without merit because we have rejected all his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

GOETHALS, J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21